SWEET *v.* STATE OF INDIANA

[No. 27,452. Filed February 28, 1941.]

184

*Oscar B. Thiel,* of Gary, and *T. Ernest Maholm,* of Indianapolis, for appellant.

*Samuel D. Jackson,* Attorney General, and *James K. Northam,* Deputy Attorney General, for the State.

RICHMAN, J.—Appellant was tried by a jury, convicted and sentenced to death on an indictment charging that he "on the 27th day of June, A. D. 1939, at and in said county of LaPorte and State of Indiana, aforesaid, did then and there unlawfully and feloniously kidnap, imprison, detain and hold one Ruth Joiner, a woman of mature years, to-wit: twenty-nine years old, at the office of Doctor P. H. Weeks, in the hospital of the Indiana State Prison, in Michigan City, County of LaPorte and State of Indiana, for the purpose and with the intent of obtaining and securing from Alfred Dowd, Warden of Indiana State Prison, certain property or things of value, to-wit: guns and an automobile as a ransom, reward or price for the return, liberation and surrender of the said Ruth Joiner, so imprisoned, detained and held." There were pleas of not guilty and insanity.

The pertinent portion of the statute upon which the indictment was based reads as follows:

". . . *whoever shall imprison, detain or hold any person at any place in this state with the intent of obtaining from any one any money, means, property or thing of value, as a ransom, reward or price for the return, liberation or surrender of the*

*person so imprisoned, detained or held,* shall be deemed guilty of the crime of kidnaping for the purpose of ransom, and, on conviction, shall suffer death, or be imprisoned in the state prison during life." (Our italics.).

Appellant's view of the factual situation disclosed by the record follows:

"The evidence in this case discloses that the defendant detained one Ruth Joiner in the physician's office in the prison hospital at Michigan City, Indiana, Mrs. Joiner having gone through the prison with a visting party. The defendant informed Mrs. Joiner that he was not going to injure her but for the purpose of the guards and those outside the prison office threatened to kill her at which time he had a butcher knife and apparent ability to do so. The only thing asked in exchange for the liberation of Mrs. Joiner was that the defendant was to be given an automobile and a machine gun and that the gates of the prison were to be opened for the purpose of permitting his escape."

While this statement omits the antecedent struggle between appellant and a prison guard, wherein the guard was severely wounded by a knife in the hands of appellant, and also disregards the fact that Mrs. Joiner was under restraint for over two hours while appellant was making known his demands and the warden was parleying until he should be able to assemble state police who released her by shooting, wounding both appellant and his victim, nevertheless the fundamental issue is presented by appellant's statement.

Among the errors assigned is the overruling of appellant's motion for new trial which specifies error in giving and refusing instructions. As to the sufficiency of the instructions the state makes no comment, relying only on the contention that the special bill of exceptions containing the instructions

is not in the record. This contention cannot be sustained. The record shows that the bill of exceptions was signed and approved by the judge on August 30, 1940, and there is an order book entry showing that thereafter on the 31st day of August in vacation the bill of exceptions was filed with the clerk of the court. This is sufficient under the statute. § 9-2103, Burns' 1933, § 2315, Baldwin's 1934.

The state tendered no instructions, appellant tendered four, each of which was refused, and the court gave eighteen on his own motion. Appellant predicates error in the giving of 4, 5 and 7. No. 4 was as follows:

"In this case the defendant has filed a special plea in which he says that he was of unsound mind at the time the offense charged in the indictment was committed by him and therefore that he is not guilty by reason of that fact, to which the state has filed an answer in general denial, denying the facts set out in defendant's special plea and upon the issues thus joined *it becomes your duty to determine,* from all the facts and circumstances in evidence in this case, *whether the defendant committed the act* as charged in the indictment and, if so, *whether the defendant was sane or insane* at the time of the commission of the act, and *if you find the defendant not guilty you will determine* from the facts and circumstances in evidence *whether he is not guilty by reason of the fact that he was insane* at the time of the commission of the act charged in the indictment." (Our italics.)

In 1913 an act was passed which somewhat complicates the criminal procedure where the defense of insanity is involved. § 9-1703, Burns' 1933, § 2217, Baldwin's 1934, Section 3 is as follows:

"In all cases where a plea of insanity is interposed as a defense, it shall be the duty of the jury or the court, if tried by it, if the defendant is found

not guilty, to find, and the jury or court shall be required to find, whether the defendant committed the act charged in the indictment or affidavit, and if so, whether the defendant was sane or insane at the time of the commission of the act, and whether not guilty because he was insane at the time of the commission of the act."

The trial court evidently intended by this instruction to inform the jury of its statutory duty but by omission of important words in one place and change of wording in another he prescribed for the jury a duty which is not part of its function in determining the guilt or innocence of the person on trial.

It will be noted from the statute that only "if the defendant is found not guilty" is there any obligation upon the jury to find:

(1) "whether the defendant committed the act"
(2) "whether the defendant was sane or insane at the time of the commission of the act"
(3) "and *whether* not guilty because he was insane" etc.

Under this instruction the jurors could not start with free minds to determine guilt beyond a reasonable doubt but were obliged at the same time to think of how they could determine the first two of these three findings. The court told them that not these two findings but only the third was to be made after they had found defendant not guilty. Were they not thus given to understand that in making up their minds as to his guilt or innocence they must have a definite opinion either that he was sane or that he was insane, and that they must forget their doubts in order to reach such a conclusion one way or the other? Under the evidence there might be no question in their minds that he did do the act. But yet they might have reasonable doubts that he was sane. To acquit, however, they must posi-

tively find him insane, which perhaps was farther than they cared to go. In this dilemma would they not be forced to lay aside their reasonable doubts as to his sanity and find him to be sane? Having done the act and having been found to be sane, guilt is established, and this in spite of the fact that they may have reasonable doubts as to sanity.

No one will contend that this statute was intended in any way to conflict with the law of reasonable doubt which, though expressed in a statute, is a common-law precept fundamental in our criminal jurisprudence. Yet, the application of the act of 1913, particularly when embodied in an instruction that does not follow the injunction of the statute, introduces an element that may so confuse a jury as to prevent its proper application of the law of reasonable doubt. Perhaps in any case but particularly in one involving capital punishment there should be no instruction interfering with the jury's primary function and right of deciding the issue of guilt free from any consideration of the secondary issues imposed by this statute. While it may be difficult we do not think it impossible to frame an instruction that properly separates these issues. Otherwise we would not be loathe to find, if possible, some constitutional limitation upon the legislative right to inject into the trial of a felony a question that might deter a juror from exercising his individual right not to agree upon a verdict of guilty because of his reasonable doubt as to the defendant's sanity.

The error in giving this instruction is emphasized by No. 5 which reads:

"The jury are instructed that the term, 'insanity' as used in the special plea and issue of insanity made by the defendant, means such perverted con-

dition of the mental and moral faculties as to render the person incapable of distinguishing between right and wrong, or consciousness at the time of the nature of the act he was committing.

"The jury are instructed that, if you find from the evidence that at the time of the alleged commission of the offense charged in the indictment, the defendant was suffering from mental aberation or sickness of mind produced by any cause, and by reason thereof his judgment, memory and reason were so perverted that he did not realize the nature and extent of the act he was doing or that he did not realize that it was wrong, *you must find that he was insane* at the time of the commission of the act with which he is charged in the indictment and for that reason, not guilty." (Our italics.)

We need not go into the question of the propriety of the definition of insanity, which is not discussed in appellant's brief, but we disapprove the instruction because it tells the jurors that on the main issue, assuming that the act was committed, to acquit him they must find that he was insane, not that they have reasonable doubt as to his sanity.

The language of the seventh instruction might have been a little clearer but it will give the court no trouble on a second trial.

Appellant's requested instruction No. 3 stated in substance that under the special plea of insanity the burden was upon the state to prove the sanity of defendant beyond a reasonable doubt. We so held in *Noelke* v. *State* (1938), 214 Ind. 427, 433, 15 N. E. (2d) 950. An instruction to this effect would be proper and might well be included as a part of the general instruction on the burden of proof. If it had been given in this case perhaps it would have tended to cure the error of the instructions herein disapproved. We are not required to determine whether

in a case where the jury is otherwise properly instructed as to the burden of proving guilt and the separation and postponement of the statutory issues until the main issue is settled, a separate instruction is necessary on the burden of proving sanity which is an integral part of the burden of proving guilt.

Other errors are properly assigned, one presenting the question as to whether the court should have permitted the appellant to be manacled in the courtroom during the trial, and, another, the right of the state to use in the trial a model of the part of the building where the events occurred. These alleged errors and others are not likely again to arise and need not be considered.

The fundamental issue is whether any conviction under the statute quoted may be sustained with a factual situation substantially as herein stated. Appellant contends that the kidnaping for ransom statute was not intended to apply to such a situation. He also insists that the "reward" demanded must be a substantial money payment. He would have us so determine apart from the plain language of the statute by consideration of circumstances under which it was enacted, other statutes involving the same or relative subject-matter, contemporaneous legislative history, and the events and mischiefs to be remedied. *C. & C. Dist. Transit Co. Inc.* v. *Mueller, Sec. of St.* (1938), 213 Ind. 530, 12 N. E. (2d) 247.

This act originated in 1901, Acts 1901, ch. 162, § 1, p. 348. Without aid from counsel our investigation discloses that a sensational kidnaping occurred December 18, 1900, at Omaha, where Edward Cudahy was taken and released the same day by Pat Crowe who demanded $25,000 ransom and was later acquitted of the crime charged. See 12 N. Y. University Law Quart.

Rev. p. 646, 650, an interesting article entitled "Kidnapping and the So-called Lindbergh Law." The circumstances of the kidnaping therein disclosed may afford some reason for the enactment of our statute which first carried penalties of life imprisonment or a determinate period of not less than 10 years. The act has been thrice amended, first at the time of the codifying of criminal offenses in 1905 when it was shortened and the penalty was changed to an indeterminate sentence of 10 to 21 years, Acts 1905, ch. 169, § 360, p. 662; again in 1907 when the only change increased the penalty to life imprisonment, Acts 1907, ch. 40, § 1, p. 59; and finally in 1935 when the alternative penalty of death was added, Acts 1935, ch. 17, § 1, p. 72. The last change occurred within a few years after celebrated kidnapings including that of the Lindbergh child.

While the offense may originally have been stated and the death penalty added on account of the notorious crimes mentioned we are not persuaded that this argument justifies our ignoring the language of the statute itself which plainly covers factual situations dissimilar to those presented in the kidnaping cases that may have occasioned the legislation. This argument was answered in *Commonwealth* v. *Blodgett* (1846), 12 Metcalf (Mass.) 56, 59 in the following language:

> "And it is not unusual in legislation, where a particular apprehended wrong or grievance is the immediate occasion for passing of an act, to extend it to other wrongs of the like kind, and make a general instead of a specific provision."

See also *State* v. *Backarow* (1886), 38 La. 316.

Turning to the subject of related legislation in Indiana, it must first be noted that no common-law crimes

are recognized but all offenses are statutory. § 9-2401, Burns' 1933, § 2, Baldwin's 1934, and cases cited thereunder. There is no statutory offense of false imprisonment. The common-law crime of kidnaping, which is said to be an aggravated false imprisonment, first became an offense, designated as "man stealing," in the Acts of 1817, ch. 24, § 1, § 2, p. 150. Since that date the crime has been stated in substantially the same language and was on the statute books when the kidnaping for ransom statute was passed. Under the kidnaping statute, § 10-2901, Burns' 1933, § 2418, Baldwin's 1934, it is essential to prove an intention to carry away "from any place within this state." *State* v. *Sutton* (1889), 116 Ind. 527, 529, 19 N. E. 602; *Cox* v. *State* (1932), 203 Ind. 544, 177 N. E. 898, 181 N. E. 469; *Epperson* v. *State* (1937), 211 Ind. 237, 239, 6 N. E. (2d) 538. Without quoting the statute it is sufficient to say that it is possible to make full proof of a charge of kidnaping for ransom without proving an "intention of having such person carried away from any place within this state." See *House* v. *State* (1917), 186 Ind. 593, 595, 117 N. E. 647. So the so-called "lesser" offense of kidnaping is not included in the "greater" offense of kidnaping for ransom, as originally contended by appellant, which contention was abandoned in the appeal. The only other statute on a related subject is the offense of "child stealing," § 10-2902, Burns' 1933, § 2419, Baldwin's 1934, which also was in existence prior to 1901. We are therefore not constrained by legislation on related subject-matter to interpret the statute before us in the manner for which appellant contends.

The contention, not specifically made, suggests itself that kidnaping for ransom is merely an enlargement

of false imprisonment and that the facts of this case do not justify the death penalty, which would not have been provided had the Legislature realized that the language of the act could be applied to an offense justifying only the ordinary penalties attached to the offense of false imprisonment. This argument was made and sustained in *Smith* v. *State* (1885), 63 Wis. 453, 23 N. W. 879. But it must be observed that in Wisconsin the common-law crime of false imprisonment is recognized. As before stated, in Indiana we have no such crime either common-law or statutory. The Wisconsin case was distinguished on another ground in *Ex Parte McDonald* (1915), 50 Mont. 348, 351, 146 P. 942, from which we quote as follows:

"The crime of kidnapping is closely analogous to the crime of false imprisonment. The latter is any unlawful violation of the personal liberty of another, both at common law and under the statute. (Rev. Codes, § 8324; McClain on Criminal Law, § 486; Bishop's Criminal Law [8th Ed.] 748.) The former is an aggravated form of the latter. At common law the element of aggravation was the removal of the person from his country or state, not the secret removal. Under the statute, the intent to remove is sufficient to complete the offense. Thus an act which, in the absence of the statute, was only a false imprisonment, is brought into the category of acts punished as the aggravated offense. It was within the power of the Legislature to do this. It might, if it chose, define and punish all false imprisonments as kidnapping. Whether it has in fact done this, thus rendering section 8324 measurably useless, it is not necessary for us to inquire at this time. Our task is at an end when, applying the elementary rule of construction to the statute, it is ascertained that the act charged in the information is within the purview of the definition there laid down. Objections to the propriety of legislation destroying the distinction between this crime and that of false imprisonment, if such is the result, should be addressed to the

Legislature. This court is not required, by resort to artificial rules of interpretation, to import into a statute a meaning which its words clearly do not convey."

While in this case the court was considering a kidnaping statute it seems to us that the language is just as appropriate to our statute creating the offense of kidnaping for ransom.

Comparing the indictment, pertinent provisions of the statute, and appellant's statement of the evidence, all above quoted, we are of the opinion that the statute is applicable to the factual situation here presented. If confirmation of this view is necessary we refer to well considered cases in other jurisdictions. *Commonwealth* v. *Blodgett, supra; State* v. *Backarow, supra; Ex Parte McDonald, supra.*

Appellant further contends that the only thing which he was seeking by the detention of Mrs. Joiner was a means of escape from prison and that the machine gun and automobile and the opening of the prison gates which he demanded as the condition of her release do not come within the statutory language "money, means, property or thing of value as a ransom, reward or price for the . . . liberation . . . of the person so . . . detained or held." While each of the words "ransom, reward or price" frequently is used in a pecuniary sense their meaning here is controlled by the context. They refer to the preceding considerations, if they may be called such, "money, means, property or thing of value." If all of them could be said to be of a pecuniary nature then the argument might lie that this statute contemplates only substantial money ransoms. But it is pointed out in *Crum* v. *State* (1937), 131 Tex. Crim. Rep. 631, 634, 101 S. W. (2d) 270, 272, under a statute read-

ing "money or valuable thing" that the "valuable thing" is not necessarily of a pecuniary nature. The court used the following language:

"Appellant's next contention is that, inasmuch as the gist of the offense consists of the extortion of money or valuable thing, therefore the phrase 'or valuable thing' should, under the rule of *ejusdem generis*, be limited to the same general kind or class of things as money. In other words, a deed, note, bill of sale, or jewelry, not being of the same kind or class as money, could be taken from any person by restraining him of his liberty without violating the statute. Money is in a class to itself and no other thing comes within the same general class; although it may be either coin or currency, whatever may be its denomination, it is money, a standard measure of values."

The statute which we are considering is not like the one involved in *McNamara* v. *State* (1932), 203 Ind. 596, 181 N. E. 512, reading "with intent to extort or gain from such person any chattel, money or valuable security or any pecuniary advantage whatsoever."

We are unable to say what the Legislature intended by the use of the word "means." It is not contended that this term covers "means of escape." But the word "property" is broad enough to include the machine gun and automobile and we think they also are within the definition of "things of value." The purpose for which they were to be used, in our opinion was immaterial. That the appellant was only concerned in escaping does not require a strained interpretation of language which used in its ordinary sense fully covers the articles desired by him as a means of escape.

For cases in other jurisdictions discussing statutory language of a similar nature, see *Gooch* v. *United States* (1936), 297 U. S. 124, 56 S. Ct. 395, 80 L. Ed. 522;

*State* v. *Andre* (1938), 195 Wash. 221, 80 P. (2d) 553, 554; *Crum* v. *State, supra; People* v. *Kristy* (1935), 4 Cal. (2d) 504, 50 P. (2d) 798.

We are not unmindful of appellant's assertion that Mrs. Joiner could not be imprisoned because she was already within the prison walls. She was detained and held against her will under threat of death at a place she was otherwise free to leave, namely, the doctor's office in the prison. The fact that she might not go outside the prison walls without the co-operation of the officials whose guest she was did not keep her from being "detained or held" within the meaning of the statute.

The jury, which was the judge of the law as well as the facts, did not give appellant the alternative penalty of life imprisonment. For what crime he ▮▮▮▮ was in the prison does not appear from the record nor, in fact, that he was under any sentence, although he was referred to as a "convict" in the testimony of one of the witnesses. So far as we may know he was already a prisoner for life and the jurors may have thought that such a sentence at their hands would be no punishment. Whether the jury's verdict was just from an ethical standpoint it is not our province to decide. We must determine now or in a future appeal whether on the facts presented by the record he might legally be convicted under this statute. So holding we must also hold that he has not had a fair trial. For error in giving the instructions above quoted the judgment is reversed with instructions to sustain appellant's motion for a new trial. The clerk of this court is ordered to direct the warden of the State prison to return the warrant for execution and certificate to the clerk of the Porter Superior Court.

. NOTE.—Reported in 31 N. E. (2d) 993.