MILLER v. STATE OF INDIANA.

[No. 28,006.   Filed December 13, 1944.]

*Christian & Waltz*, of Noblesville, for appellant.

*James A. Emmert*, Attorney General, *Frank Hamilton*, First Deputy Attorney General, *and Frank E. Coughlin*, Deputy Attorney General, for the State.

FANSLER, J.—The appellant was convicted of murder in the second degree and sentenced to life imprisonment. His motion for a new trial was overruled, and error is assigned here upon the giving and refusal to give certain instructions.

There is evidence that the defendant, 46 years of age, is a veteran of the First World War. He saw active service in the front lines and was gassed and shell-shocked while cutting barbed wire entanglements between the lines. He never fully recovered from those experiences, and he draws a pension from the government. He is partially blind in one eye and repeatedly went to a Veterans' Hospital for treatment. "When there was a sudden loud noise he would become hilarious, emotional and excited and that he talked incoherently and would repeat many times what would be said; that on such occasions he would look wild. On those occasions when he talked incoherently and looked wild that his conversation was 'irrational.'" He was unmarried and lived with his mother. The man who was killed was his life-long friend. They were described by witnesses as "buddies." The appellant said he was his "true friend." On the evening of January 15, 1943, the appellant and the deceased were in a tavern from 9 o'clock to approximately 11 o'clock. They drank two

bottles of beer each during that time and appellant drank some wine. Each had a sandwich and coffee before they left the tavern. At appellant's invitation his friend went with him to his home, and they took three bottles of beer with them. At approximately 2:45 o'clock in the morning the appellant went to the house of a neighbor, announcing excitedly that he had killed a man, that he did not know who he was, that "they have got me for murder." He asked the neighbor to call the sheriff. The sheriff and appellant's brothers went to appellant's home. The deceased was found sitting in a chair close to the wall, with his head resting against the wall and his arms hanging down. In one hand was a cigarette which had burned down to his fingers and gone out and in the other hand was a box of matches. There was a bullet hole in his head, and the bullet, afterwards located in the brain, was found to have been fired from the revolver hereafter referred to. Death was instantaneous. The appellant made various statements at that time. He was loud and boisterous and laughed hilariously. He kept repeating such expressions as "dead as hell, ain't he." Witnesses described his conduct as "hilarious, hysterical, and silly." One witness said that the appellant was sitting in a chair, laughing and talking, and asked some of those present if Mallott was not dead, and if they had ever seen a deader man. This witness "thought he wasn't coherent," that there was something wrong with him; he thought he was "out of his head on account of too much liquor," that he was just coming out of an intoxication, "that there was something terribly wrong with his mind." At this time appellant said he went to get his brother's address out of a table drawer for the deceased; that the deceased took from the drawer an ancient rim-fire revolver and was examining it to find

the name of the maker; that the appellant attempted to take the gun away from him and it went off. The three beer bottles were found empty in the room. A bottle of whiskey, almost full, was found behind a door in another room, and there is evidence that this was the property of the appellant's mother and that she used it medicinally. On the witness stand the appellant testified that he and the deceased went to his home together; that they had planned to go fishing the next day; that the deceased wanted his brother's address and he went to a table drawer and got it for him; that appellant then went to stir the fire, and while he was doing this the deceased got the gun out of the table drawer and was examining it to ascertain the name of the maker; that appellant said: ". . . that is loaded, give me the gun. . . I will unload it and then we can see what the name of it is"; that the decedent gave it to him, and, while seeking to take it apart, it was discharged accidentally when "pointed toward the stove" in the room; that he remembered nothing that transpired from that time until much later when he was in jail; that while getting his brother's address from the table drawer he had taken out some fishhooks and given them to his friend. Fishhooks were found upon the deceased. An expert on firearms testified that the revolver was a very old one, using rim-fire cartridges; that when the gun was loaded the cylinder could be revolved only by raising the hammer; that the firing-pin is attached to the hammer; that if the hammer slipped when being drawn back it would accidentally discharge the gun. While demonstrating the workings of the gun to the jury, the hammer slipped from the thumb of the expert, and he explained that if it had been loaded it would have been accidentally discharged.

It seems to have been the theory of the defense that

the bullet ricocheted from the stove. The evidence upon this question is inconclusive and does not seem highly important. There was no evidence of a struggle, and the position of the deceased seems to conclusively negative the inference that there was a scuffle for the gun in which it was discharged. There is no evidence of ill will, or trouble, or motive of any kind. The witnesses say that in his incoherence the appellant kept repeating: "He was my true friend." It seems to have been the State's theory that the appellant was incoherent from intoxication and that the killing was the intentional act of one degraded and depraved morally because of drink. It is the defendant's theory that the killing was purely accidental, as indicated by his testimony; that the only evidence which tended to establish a criminal homicide was the incoherent and irrational statements of the defendant immediately after the accident; that he had consumed only two bottles of beer and a glass of wine between 9 and 11 o'clock, and that from that time until 2:30 in the morning he had shared three bottles of beer with the deceased; that his hysterical condition was not caused by intoxication, but by the shock occasioned by the accidental killing of his friend. Insanity was not interposed or plead as a defense, but it was contended by the defense that immediately after the shot was accidentally fired the defendant became temporarily insane, and for that reason little, if any, consideration should be given to his statements made immediately thereafter.

These facts are recited not for the purpose of expressing opinion as to the weight of the evidence or its sufficiency, but as background for a discussion of the instructions. The purpose of instructions is to inform the jury of the law applicable to the facts in such a manner that the jurors will not be mis-

led, and that they may clearly comprehend and understand the case and arrive at a just, fair, and correct verdict. Jurors are laymen, unversed in the technicalities of the law, and this fact should be considered in drafting instructions. An instruction may correctly state the law, and yet, because of involved and obscure language, unintelligible to the layman who hears it read but once, be so misleading as to be prejudicial and therefore erroneous. 23 C. J. S., *Criminal Law*, § 1306, p. 893; *Clem* v. *State* (1869), 31 Ind. 480; *Bradley* v. *State* (1870), 31 Ind. 492; *Mitchell* v. *State* (1923), 193 Ind. 1, 138 N. E. 507; *Wrench* v. *State* (1926), 198 Ind. 61, 152 N. E. 274.

The jury was instructed that: "If the killing of the person mentioned in the indictment has been satisfactorily shown by the evidence, beyond all reasonable doubt, to have been the act of the defendant, then the law presumes it to have been murder, provided the jury further believe from the evidence, beyond a reasonable doubt, that no circumstances existed excusing or justifying the act, or mitigating it so as to make it manslaughter." This instruction was clearly and obviously erroneous. It eliminates the necessity of proving malice and intent.

The "law" never presumes murder upon any state of facts. "It is the exclusive province of the jury to indulge in a presumption of guilt." *Vaughn* v. *State* (1939), 215 Ind. 142, 149, 19 N. E. (2d) 239, 242. There is an exhaustive discussion of this subject in *Dedrick* v. *State* (1936), 210 Ind. 259, 2 N. E. (2d) 409. If the death of a person is caused by the negligent but unintentional act of another, it is not excusable or justified. It is a wrong, a tort, but it is not a crime and it is not murder. The "proviso" method of connecting essential elements of the

crime with those already specified is confusing and tends to leave the impression that those elements following the proviso are secondary or after-thought considerations. Where plain, straightforward definitions can be given, circuitous, confusing methods should be avoided. The statutory definitions of murder in the first and second degrees are plain and understandable. In so far as applicable to the case, they were given to the jury in another instruction as follows:

"Whoever purposely and with premeditated malice kills any human being is guilty of murder in the first degree."

"Whoever purposely and maliciously, but without premeditation kills any human being is guilty of murder in the second degree."

The giving of this instruction correctly defining murder does not correct the erroneous one. *Brannin* v. *State* (1943), 221 Ind. 123, 46 N. E. (2d) 599, and cases cited.

The defense tendered an instruction to the effect that if the State had failed to prove a motive, and the failure was sufficient to raise a reasonable doubt in the minds of the jurors, it was their duty to acquit. In a number of other instructions the jury was advised concerning reasonable doubt, and it may not have been error to refuse this specific instruction, although it would seem, in the light of the facts, that it would have been highly proper to have given it as an aid to the jury in its deliberations.

The appellant tendered several instructions advising the jury that the admissibility of his statements was primarily for the court to determine, but that if he made statements or confessions after the shooting he had a right to show whether he was sane or insane at the time such statements or con-

fessions were made; that if the jury should find that the defendant was temporarily insane, and was not conscious of what he was saying, it had a right to take that fact into consideration in determining what weight, if any, it would give his statements. These instructions were refused. The court did give an instruction which told the jury in part: "A person who indulges in the excessive use of intoxicating liquors, and thereby becomes degraded and depraved in his morals, is not necessarily, for that reason alone, to be considered insane, so as to absolve him from responsibility for a crime he commits." This instruction appears to have been upon the State's theory that the killing was motivated by some sort of drunken immorality. The theory of drunkenness seems to have had some, if not most, of its support in the incoherent ravings of the defendant. There is no evidence that he was intoxicated at the time he left the tavern with his friend, and no evidence of his drinking thereafter except that three bottles of beer were consumed between them in approximately three hours. In view of the evidence and this intoxication instruction, it must be concluded that a fair presentation of the case required the giving of the instruction upon temporary insanity submitted by the defense. The instruction last quoted contains this statement: "Mere moral insanity or moral depravity has no standing under the laws of our state." Error is not assigned upon the giving of this instruction. Whether the terms "moral insanity" and "moral depravity" are used synonymously is not .clear. It is pointed out in *Bradley* v. *State, supra,* that there is a distinction between "insanity" and "moral depravity." Instructions should be drafted with a view to clarifying the rules of law, and expressions that tend to confuse or mislead should be avoided. Upon another trial, proper instructions

upon the question of motive and the defendant's mental condition at the time of his confession and statements regarding the crime should be given.

Other questions presented will probably not arise again.

For the errors indicated, the judgment is reversed, with instructions to sustain the appellant's motion for a new trial.

Note.—Reported in 58 N. E. (2d) 114.