FLOWERS *v.* STATE OF INDIANA.

[No. 29,336.   Filed December 27, 1956.]

*N. George Nasser* and *John A. Kesler,* of Terre Haute, for appellant.

*Edwin K. Steers,* Attorney General, *Owen S. Boling* and *Richard M. Givan,* Deputy Attorneys General, for appellee.

EMMERT, J.—This is an appeal, in *forma pauperis,* from a judgment on a verdict finding appellant guilty of murder in the first degree and fixing the penalty at death. The assignment of errors questions the actions of the trial court in overruling appellant's plea in abatement, and his motion for new trial.

On December 10, 1956, the Governor commuted appellant's sentence to imprisonment for life. The rule

is well settled in this state that an applicable statute by operation of law becomes a part of the judgment as though written therein. *Dowd* v. *Sims* (1950), 229 Ind. 54, 95 N. E. 2d 628; *Woodward* v. *Murdock* (1890), 124 Ind. 439, 24 N. E. 1047; *State ex rel. Reed* v. *Howard* (1946), 224 Ind. 515, 69 N. E. 2d 172; *Mellot* v. *State* (1942), 219 Ind. 646, 40 N. E. 2d 655. Likewise, Section 17 of Article 5 of the Constitution of Indiana, which granted the Governor the power to commute this sentence, becomes a part of this judgment, as well as the official act of commutation. Appellant is still held in custody by authority of the judgment herein, which is still final, so that appellant's right to appeal therefrom is not diminished or extinguished by the commutation.

The appellant filed a plea in abatement to the indictment in which he charged that the order of the court for the drawing of the grand jury which returned this indictment, under §4-3320, Burns' 1946 Replacement, required the drawing to be at 10:00 o'clock A.M. Daylight Savings Time instead of specifying the time as Central Standard Time as required by §2-4705(b), Burns' 1946 Replacement (Supp.), and that by reason thereof the action should abate. The state did not demur to this answer, nor did it file any reply, nor was any trial had on this issue. The court set arguments on the plea in abatement for November 30, 1954, and on this latter date, in the presence of appellant, his counsel and the Prosecuting Attorney, the court overruled the plea in abatement. This procedure was unauthorized and an improper way to dispose of this answer. However, it is quite apparent the parties and the court considered the plea as if it had been tested by a demurrer, and cause No. 37 of appellant's motion for new trial charged, "the court committed error of law in sustaining the State of In-

diana's Demurrer to the Plea in Abatement filed by this defendant." When a party agrees to a manner for determining his rights in the trial court, he cannot claim error on appeal because this procedure was adopted. *State ex rel. Cline* v. *Schricker* (1949), 228 Ind. 41, 45, 88 N. E. 2d 746, 89 N. E. 2d 547. See also *Fritz* v. *State* (1912), 178 Ind. 463, 469, 99 N. E. 727. The plea in abatement failed to assert noncompliance with the statutory requirements as to time was in bad faith, nor did it show harm to the substantial rights of appellant. The presumption is every requirement of the statute on drawing a grand jury was complied with except the drawing was one hour earlier than it should have been. This is not sufficient to hold it an illegal grand jury. The facts in *Rudd* v. *State* (1952), 231 Ind. 105, 107 N. E. 2d 168, where we held a plea in abatement good, furnish no basis for a reversal of this case.

The motion for a new trial challenges the sufficiency of the evidence to sustain the verdict of guilty. Although we examine the evidence on appeal to see if there was substantial evidence of probative value to prove each material allegation of the offense charged, we do not weigh the evidence nor judge the credibility of the witnesses and we only consider the evidence most favorable to the State, and the reasonable and logical inference to be drawn therefrom to determine whether there was a failure of proof. *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769; *Todd* v. *State* (1951), 230 Ind. 85, 101 N. E. 2d 922.

We have carefully examined the entire transcript consisting of more than 1,000 pages, and from the bill of exceptions containing the evidence, the following facts were disclosed:

Appellant and Iona Kennedy (generally called Ione) were married about three years before the homicide,

and until May or June, 1954, were residing in ■ a room of a rooming house kept by Catherine Helmick at 113 Harding Avenue in Terre Haute. Mrs. Kennedy had two small children by a former marriage, and all four lived in the same room. The mother worked as a waitress, and appellant had a light truck with which he did odd jobs and hauling. During May or June of that year, Mrs. Kennedy sued appellant for divorce, which was granted some weeks before the homicide. When the suit was first filed, appellant had moved elsewhere, but later moved back to a room at 111 Harding Avenue, where he lived and ate his meals. The parties saw each other at various times even when the divorce was pending, but about three weeks before the homicide, Mrs. Kennedy was keeping company with one Leland Fish, and was planning to move from her room at 113 Harding Avenue. This relationship came to the notice of appellant, who, without success, attempted to effect a reconciliation, and several witnesses testified appellant said he was going to kill Mrs. Kennedy. He tried to borrow $20 to buy a pistol, tried to borrow one, and did have a .32 revolver a day or so before Monday, October 4, 1954. On this evening he came to Mrs. Helmick's kitchen, asked if Mrs. Kennedy was going to move and said, "Kate, I am not going to kill Ione in your back yard but I will wait until she moves and then I am going to kill her."

At about 7:45 o'clock the same night appellant asked Mrs. Helmick to go upstairs and get Ione, and Mrs. Helmick sent her daughter, Shirley Sankey, to convey the message to Mrs. Kennedy, who came downstairs and went into the back yard to see appellant. Mrs. Sankey heard them quarreling, and then heard somebody running on the cinders in the back yard, and heard Mrs. Kennedy "hollering, 'Please don't Elmer,' 'Elmer please don't.'" She heard one shot, and then Mrs.

Kennedy scream. Mrs. Sankey ran outside and saw Mrs. Kennedy lying on her back and "Elmer standing over her with a gun in his hand." "He shot once more straight into her body and her legs quivered and she moved." "He fired another shot." After the last shot, "He stood there clicking the gun over her body." Then he pointed the gun at Mrs. Sankey and "clicked it once." When the gun was examined at police headquarters it contained three fired cases, and one loaded bullet, the primer of which had been hit by the hammer. Photographs of the decedent show two bullets entered the left side of her chest only a few inches apart.

Police officers Tryon and Collins were in a patrol car at the time near the scene, heard the shots, and drove at once in a back alley, where they saw appellant and the deceased. Appellant made no attempt to flee, and there he was arrested, the gun taken from him, and later he was taken to police headquarters. He was asked why he shot Mrs. Kennedy, and he said, "she had been running around . . . if he couldn't have her no one else could have her." While appellant was in the police car at the scene of the homicide he said to officer Bealmer, "If I can't have her nobody will and I'm glad it's over."

Later that night at police headquarters he was questioned at length about the shooting, but he refused to sign a written confession until he had his lawyer look it over. He made no demand for a lawyer before being questioned, and he was not coerced nor was any statement made under inducement. The record fails to show he was deprived of his right to counsel. *Eiffe* v. *State* (1948), 226 Ind. 57, 63, 77 N. E. 2d 750; *Marshall* v. *State* (1949), 227 Ind. 1, 10, 83 N. E. 2d 763.[1]

---

1. "The general rule is that it is no objection to the admissibility of a confession that it was made by the accused when he was without counsel. [Citing cases.]" *Eiffe* v. *State* (1948), 226 Ind. 57, 63, 77 N. E. 2d 750.

Robert Flowers, a brother of appellant, testified that they heard of the shooting that night, and with four other members of the family drove to Terre Haute from Marshall, Illinois; that after they went to the rooming house they went to the city hall two times, and asked to see appellant while he was being questioned, but they were not permitted to see him that night, nor at the county jail for a period of at least ten days. However, the next day the brother employed counsel, John A. Kesler, to represent appellant. There was no showing that appellant was ever denied the right to see his counsel at any time, and from October 11th the counsel appeared of record for appellant. We fail to see how the refusal to permit the relatives to see appellant when he was being questioned at the city hall deprived him of any constitutional right. Appellant was forty-two (42) years of age, freely talked about the shooting from the time he was first arrested, and made no demand to see his relatives or a lawyer before he talked. No force, fraud, coercion or inducements were used to obtain his oral confession, and there was no error in any of the court's rulings admitting the same in evidence.

Nor did the court commit error in refusing to direct a verdict for appellant, and we cannot hold the verdict was not sustained by sufficient evidence.

Appellant filed a special plea that he was of unsound mind at the time the offense charged was committed, to

---

"It is true that the law protects accused persons from ill treatment and unfair advantage by law officers, but it is also true that the securing of voluntary confessions from guilty persons is desirable, and should be allowed in the interest of the public welfare and safety. *Bonahoon* v. *State* (1931), 203 Ind. 51, 55, 178 N. E. 570, 79 A. L. R. 453; *Schuble* v. *State, supra; Mack* v. *State, supra; Caudill* v. *State, supra.* When police officers arrest a person suspected of or charged with crime they may, in proper manner, question him without providing him a lawyer and without advising him of his constitutional rights to counsel." *Marshall* v. *State* (1949), 227 Ind. 1, 10, 11, 83 N. E. 2d 763.

which the State filed a reply of general denial.
■ Section 9-1701, Burns' 1956 Replacement. There
was a conflict in the evidence on this issue, and
it is sufficient to note there was sufficient evidence to
require the State to prove beyond a reasonable doubt
that appellant was of sound mind at the time the shoot-
ing occurred. This burden never shifted from the State.
*Noelke* v. *State* (1938), 214 Ind. 427, 433, 15 N. E. 2d
950; *McHargue* v. *State* (1923), 193 Ind. 204, 139 N. E.
316; *Walters* v. *State* (1915), 183 Ind. 178, 108 N. E.
583.[2]

The court gave to the jury State's requested instruc-
tion No. 9, as follows:

> "Under our law, a person of unsound mind can-
> not be convicted of any crime, but, even though
> there was some mental derangement, still if the de-
> fendant, Elmer John Flowers, had mental capacity
> sufficient to adequately comprehend the nature and
> consequences of his act, and unimpaired will power
> fully sufficient to control an impulse to commit
> crime, he is not entitled to an acquittal upon the
> grounds of mental incapacity."

Appellant objected to this instruction because it elimi-
nated the requirement that the State prove sanity

---

2. "Every person is presumed to be sane and this presump-
tion is sufficient to constitute a *prima facie* case in favor of the
State where there is no evidence to dispute it and for this rea-
son the State is not required to introduce evidence in chief to
prove the sanity of the defendant. However, where there is some
evidence introduced upon the issue of the defendant's sanity and
the jury is called upon to consider such evidence for the purpose
of determining his guilt or innocence, it must find that the State
has sustained the burden which the law imposes and that the
evidence in the case establishes the sanity of the defendant be-
yond a reasonable doubt." *Walters* v. *State* (1915), 183 Ind.
178, 179, 180, 108 N. E. 583.

"The evidence of appellant's insanity need not predominate in
weight over that going to show his sanity, if the jury found it
sufficient to raise a reasonable doubt of his sanity, the law re-
quires an acquittal." *Fritz* v. *State* (1912), 178 Ind. 463, 467,
99 N. E. 727.

beyond a reasonable doubt. The wording of the instruction is unfortunate in that unimpaired will power was stated as sufficient to control an impulse to commit crime, which could have been understood by the jury as criminal acts in general, instead of limiting the will power to the specific crime charged. Under §9-1701, Burns' 1956 Replacement [Acts 1913, ch. 298, §1, p. 774], the plea is the accused "was of unsound mind at the time the offense charged was committed." By §§9-1702 and 9-1703, Burns' 1956 Replacement, it is clear the Legislature used the term "insanity" as synonymous with "unsoundness of mind."[3] The instruction purported to cover all the law on the subject of insanity as defined by the criminal law, and due to its concluding clause, was mandatory in form on the main issue being tried. Under the law and evidence in this case, the duty was upon the State to prove the accused sane, as defined by the Indiana law on criminal responsibility, beyond a reasonable doubt. Under the Indiana rule on criminal insanity, an accused could be in fact of unsound mind or insane, yet responsible for a criminal act, but he would still be entitled to an acquittal if the State failed to prove him criminally responsible for the act charged beyond a reasonable doubt. The instruction prohibited an acquittal on the mental capacity appellant had, not on the mental capacity the State proved he had beyond a reasonable doubt. Since this instruction was mandatory, it was not cured by other instructions given on the burden of proof on the issue of insanity. In *Sweet* v. *State* (1941), 218

3. Section 8-201, Burns' 1933 [2 R. S. 1852, ch. 14, §1, p. 333], stated: "The words 'person of unsound mind,' as used in this act or any other statute of this state, shall be taken to mean any idiot, non compos, lunatic, monomaniac or distracted person." But even though an accused be of unsound mind or insane he still may be responsible for his criminal acts under the Indiana rule on insanity.

Ind. 182, 189, 190, 31 N. E. 2d 993, this court criticized an instruction on insanity which did not require the State to prove insanity beyond a reasonable doubt. See also *Todd* v. *State* (1951), 229 Ind. 664, 101 N. E. 2d 45. The instructions in *Flatter* v. *State* (1914), 182 Ind. 514, 521, 522, 107 N. E. 9, and *Hengstler* v. *State* (1934), 207 Ind. 28, 31, 189 N. E. 623, are not analogous to the instruction here considered.

The defendant's requested instruction No. 2, which was refused, is as follows:

"I instruct you, that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

"In determining whether there was a mental defect at the time of the commission of this act, it is proper for you as jurors to take into consideration said mental illness or mental defect, if any, characterized by brooding, if any, and reflection, if any.

"You should determine whether or not the accused is suffering from a mental disease or mental defect at the time the crime was committed, and if so, you should determine if there was a causal connection between the mental disorder and the act, and if you find there was, then your verdict should be not guilty."

It is not necessary to consider the modification of this instruction as given by the court, for if there was any error in it such was invited.

By this instruction appellant seeks to establish a new test for a defense of unsoundness of mind in criminal causes, such as was established by *Durham* v. *United States* (1954), 214 F. 2d 862. This case laid down the rule not unlike that followed in *State* v. *Pike* (1870), 49 N. H. 399. It would unduly extend this opinion to review all the arguments for and against the Durham rule and the McNaghten rules. See Hall, *Responsibility and Law: In Defense of the McNaghten Rules*, 42 A.B.A. J. 917 (1956) ; Sobeloff, *Insanity and the Crimi-*

*nal Law: From McNaghten to Durham, and Beyond,*
41 A.B.A. J. 793 (1955) ; Keedy, *Insanity and Criminal
Responsibility,* 30 Harv. L. Rev. 535-560; Keedy, *Irresistible Impulse as a Defense in the Criminal Law,*
100 U. Pa. L. Rev. 956-993 (1952) ; 30 Ind. L. J. 194-217
(1955).

"It is axiomatic that without a criminal intent there
is no crime, and without mental capacity for it there
can be no criminal intent." *Fritz* v. *State* (1912),
■ 178 Ind. 463, 466, 99 N. E. 727. When an accused files a plea he was of unsound mind and
there has been some evidence on this, the decisions of
this court are clear the State must prove:

1. That the accused could know and comprehend the nature and consequences of his act. The
nature of the act embraces knowledge on his part
that the act was wrong, for if the accused be unable
to distinguish right from wrong he would not know
the nature of his act.

2. That the accused had sufficient will power to
control his impulse to commit the act charged.

If the State fails to prove either requirement beyond
a reasonable doubt there has been a failure of proof
on this issue. *Stevens* v. *State* (1869), 31 Ind. 485;
*Bradley* v. *State* (1869), 31 Ind. 492; *Goodwin* v. *State*
(1884), 96 Ind. 550; *Plake* v. *State* (1890), 121 Ind.
433, 23 N. E. 273; *Morgan* v. *State* (1921), 190 Ind.
411, 130 N. E. 528; *Kallas* v. *State* (1949), 227 Ind.
103, 83 N. E. 2d 769.[4]

The Durham rule "is simply that an accused is not
criminally responsible if his unlawful act was the prod-

---

4. "It is undoubtedly the law, as charged by the court below,
that if the defendant was moved to the act by an insane impulse
controlling his will and his judgment, then he was not guilty
of the crime charged." *Stevens* v. *State* (1869), 31 Ind. 485, 488.

"A person may have sufficient mental capacity to know right
from wrong, and to be able to comprehend the nature and con-

uct of mental disease or mental defect." *Durham* v. *United States* (1954), 214 F. 2d 862, 874, 875, *supra.*[5] This is a radical departure from Mc-

sequences of his act, and yet be not criminally responsible for his acts; for, if the will power is so impaired that he cannot resist an impulse to commit a crime, he is not of sound mind. *Goodwin* v. *State*, 96 Ind. 550, and cases cited; *Conway* v. *State*, 118 Ind. 482. If the lack of will power is the result of a diseased state of the mind, there is mental unsoundness within the meaning of the law; but if the will is simply overborne by ungoverned passion, there may be criminal responsibility. *Goodwin* v. *State, supra,* and authorities cited." *Plake* v. *State* (1890), 121 Ind. 433, 435, 23 N. E. 273.

"In order for the state to convict in this case it was necessary not only to show beyond a reasonable doubt that the defendant could resist or control his impulse to kill Pauline MacDonald, but it must further be shown that he did have sufficient mental power to know that such act was wrong and that he could comprehend the nature and consequences of his act. . . .

" . . . In instruction No. 11 the jury were told that, if the defendant knew the nature of the quality of his act, or knew the act was wrong, then he is held responsible under the law for his acts, thus making a knowledge of right and wrong the sole test of insanity. This was error." *Morgan* v. *State* (1921), 190 Ind. 411, 417, 418, 130 N. E. 528.

Dean Keedy reports 108 members of the Group for the Advancement of Psychiatry were asked, "Are there cases where a person, suffering from mental derangement, knows that it is wrong to inflict bodily harm (killing, maiming, ravishing) upon another person, but owing to the mental derangement is incapable of controlling (resisting) the impulse to commit such bodily harm?" Ninety-three answered yes, nine answered no, and six had the opinion no definite answer could be given. 100 U. Pa. L. Rev. 989.

5. The court, in explanation of its rule, said: "But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you

Naghten's rules which hold an accused should be acquitted if "at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." *Daniel McNaghten's Case* (H. L. 1843), 10 Clark & Finnelly 200, 210, 8 Eng. Rep. 718, 722. The Indiana rule has adopted the McNaghten rule in part, but added the irresistible impulse test.[6] We are not persuaded we should adopt the Durham rule.

How would a jury be instructed on what would be "the product of mental disease?" Would it be the sole cause, or merely a cause, or when would a cause be too remote to be a product of a diseased mind? Should we attempt to adopt the law of torts on proximate cause?

The historic function of the jury is to find the facts and apply the law as instructed by the court. It is true that the jury has the power, as distinguished from the right, to return a verdict against the facts or the law, which generally depends upon the jury's inherent sense of justice in the cause. Such an indefinite standard as a product of mental disease or mental defect can hardly clarify a juror's mind, or do more than put the matter for his decision according to his personal sense of justice as a matter of legal right.

---

find to be fairly deducible from the testimony and the evidence in this case." *Durham* v. *United States* (1954), 214 F. 2d 862, 875.

6. "It is difficult to see, from an abstract consideration of the question, why courts should have refused to recognize irresistible impulse as a defense, when it so clearly negatives a necessary element of crime, and when they without hesitation recognized other manifestations of lack of volition." Keedy, *Insanity and Criminal Responsibility*, 30 Harv. L. Rev. 535, 548 (1917).

Under the Durham test an accused could know the nature and quality of his act, know that it was wrong, have the will power to restrain his act, and yet by reason of his mental disease, develop egocentric or sadistic tendencies which could produce homicide with criminal impunity. Perhaps mental disease or defect which falls short of legal insanity should be a mitigating circumstance in all felony cases, but if so, it should be a matter of legislative enactment. When a jury may easily understand the product of any mental disease or any mental defect furnishes a legal excuse for crime, we are not presently convinced we should overrule our decisions on insanity as a defense to crime. There was no error in refusing defendant's requested instruction No. 2.

The court refused to give appellant's requested instructions No. 4 and No. 6, both of which were on the law of irresistible impulse. The court gave parts of both instructions as modified, which in legal effect made them the court's instructions. Modified No. 6 states:

"Members of the Jury, I instruct you that it is the law in Indiana that a person may have sufficient mental capacity to know right from wrong and to be able to understand the nature of his act and the results of his act and not be criminally responsible for his actions, if the will power is so impaired by an insane mind that he cannot resist an impulse to commit a criminal act then he is not of sound mind."

Modified No. 4 was similar in terms. The law was correctly stated to the jury. *Stevens* v. *State* (1869), 31 Ind. 485, *supra*; *Bradley* v. *State* (1869), 31 Ind. 492, *supra*; *Goodwin* v. *State* (1884), 96 Ind. 550, *supra*; *Morgan* v. *State* (1921), 190 Ind. 411, 130 N. E. 528; *Swain* v. *State* (1939), 215 Ind. 259, 18 N. E. 2d 921; *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769, *supra*.

It is not error to refuse a tendered instruction if the same is substantially covered by another or other instructions given to the jury. *Hedrick* v. *State* (1951), 229 Ind. 381, 387, 98 N. E. 2d 906; *Peltz* v. *State* (1953), 232 Ind. 518, 112 N. E. 2d 853; *Todd* v. *State* (1954), 233 Ind. 594, 122 N. E. 2d 343. There was no error in refusing these instructions.

The court refused appellant's requested instruction No. 10 which is as follows:

"I instruct you that without a criminal intent there is no crime under this indictment as charged, and without mental capacity for it there can be no criminal intent. The defendant's sanity or mental capacity to form the intent to kill, is in issue under this indictment and is an essential element of the offense with which he is charged. This element the State is bound to prove beyond a reasonable doubt, and not merely by a preponderance of the evidence. The evidence of defendant's sanity at the time of the commission of this offense need not predominate in weight over that going to show his sanity. And if there is a reasonable doubt in your mind of his sanity at the time of the commission of this offense, the law requires that you find him not guilty."

This instruction as tendered was based upon the law declared in *Fritz* v. *State* (1912), 178 Ind. 463, 466, 467, 99 N. E. 727, *supra*. The modified instruction the court did give omitted everything after the first two sentences. It is true that the general rule is the court need not embody all the law of the case in any one instruction, and that the instructions are to be construed as a whole. However, in this case the court did not so instruct the jury. The instructions given to the jury did not define what was an essential element of the offense with which he was charged. Other instructions did correctly define the test for determining insanity under the Indiana decisions and put the burden of proof upon the State to prove sanity beyond a rea-

sonable doubt, but none of them specifically stated the State was bound to prove appellant's mental capacity to form the intent to kill beyond a reasonable doubt. The right to request a specific instruction under §9-1805, Burns' 1956 Replacement, and Rule 1-7 is a valuable right to insure the jury is fully and fairly instructed on the law it is to apply to the facts. In cases too numerous to cite, we have held that general instructions which are correct as far as they speak are not erroneous, and that the party's remedy is to properly request an instruction specific on the point under consideration. If we are to hold that the party must request a specific instruction to raise the point of law, and after it has been requested it may be refused when it is not clearly adequately or substantially covered by other instructions equally clear, the party is given a right without a remedy, and requested instructions fail to furnish a means whereby a party may fully and adequately present to a jury his legal right in the controversy.

It is error to refuse a tendered instruction which is correct on a particular issue or point of law, if it is not substantially covered as to the point or issue in another instruction. *Snyder* v. *State* (1877), 59 Ind. 105. The party tendering such an instruction is not required to make an objection to its refusal. *Gilmore* v. *State* (1951), 229 Ind. 359, 98 N. E. 2d 677; *Stokes* v. *State* (1954), 233 Ind. 300, 305, 119 N. E. 2d 424.

Defendant's requested instruction No. 39 is as follows:

"Gentlemen of the Jury, I instruct you that the law of Indiana recognizes temporary insanity. You are not to be influenced by the statement of any medical physician who testifies, if they testify, that there is no such thing as temporary insanity. There is a distinction between the definition of temporary insanity in the law and in medicine, and it is the law in Indiana that if a person is temporarily in-

sane at the time of the commission of the alleged act, then you must find him not guilty."

No instruction was given on the law of temporary insanity. The court on its own motion modified this instruction by striking out the word "temporary" in each place, and as amended gave it to the jury.[7] "Temporary" is defined as "Lasting for a time only; existing or continuing for a limited time; not permanent; . . . ." Webster's Int. Dictionary (2d Ed. Unabridged). We judicially know some forms of insanity may not be permanent. See *Miller* v. *State* (1944), 223 Ind. 50, 58, 58 N. E. 2d 114. Although §9-1701, Burns' 1956 Replacement, does not provide for a plea of temporary insanity, (*Brattain* v. *State* (1945), 223 Ind. 489, 498, 61 N. E. 2d 462), it only requires that the plea state the defendant "was of unsound mind at the time the offense charged was committed." Section 9-1704a, Burns' 1956 Replacement, clearly recognizes insanity may be temporary.[8] It was error to refuse this instruction.

---

7. The resulting instruction hardly clarified the insanity issue. It stated: "Gentlemen of the Jury, I instruct you that the law of Indiana recognizes insanity as a defense. You are not to be influenced by the statement of any medical physician who testifies, if they testify, that there is no such thing as insanity. There is a distinction between the definition of insanity in law and in medicine, and it is the law in Indiana that if a person is insane at the time of the commission of the alleged act, then you should find him not guilty."

8. "If, in any criminal action, the court or jury trying the cause finds the defendant not guilty on the ground of insanity, the court shall find as to the defendant's sanity at the time of the trial, and if the court shall find that the defendant is insane at the time of the trial, he shall order the defendant, whether male or female, committed to the division for maximum security of the Dr. Norman M. Beatty Memorial Hospital; or if he shall find that the defendant is sane at the time of trial, but the recurrence of such an attack of insanity highly probable, he shall order the defendant committed as above provided. Such person shall be confined in such hospital until released as hereinafter provided." Section 9-1704a, Burns' 1956 Replacement [Acts 1951, ch. 238, §1, p. 682].

Appellant's motion for a new trial charges misconduct of one of the jurors. Since this cause must be reversed for other errors, and such specific issue will not recur on a retrial, it is not necessary to decide such question now. The same rule applies to other asserted errors which are unlikely to be presented in another trial. We are only required to decide necessary issues. *Willets* v. *Ridgway* (1857), 9 Ind. 367; *Bowen* v. *Stuart* (1891), 128 Ind. 507, 26 N. E. 168, 28 N. E. 73; *Walls* v. *State ex rel. Mallott* (1895), 140 Ind. 16, 38 N. E. 177; *Carmel Natural Gas Co.* v. *Small* (1898), 150 Ind. 427, 47 N. E. 11, 50 N. E. 476.

Judgment reversed, and new trial ordered.

Achor, C. J., Arterburn, Bobbitt and Landis, JJ., concur.

NOTE.—Reported in 139 N. E. 2d 185.