KESTLER *v.* STATE OF INDIANA

[No. 28,346. Filed April 6, 1949. Rehearing denied May 17, 1949.]

Emmert, J., dissents with opinion.

Gilkison, J., dissents with opinion.

*Prentice & Prentice,* and *McBride & Smith,* all of Jeffersonville; and *W. Clarke Otte* and *Wm. S. Hamilton,* both of Louisville, Kentucky, for appellant.

*Cleon H. Foust,* Attorney General, *Frank E. Coughlin,* First Deputy Attorney General, *Merl M. Wall,* Deputy Attorney General, for appellee.

STARR, C. J.—The appellant was convicted of murder in the first degree and sentenced to the Indiana State Prison for and during his natural life. From that judgment he has appealed to this court, contending that the verdict of the jury is not sustained by sufficient evidence and that it is contrary to law.

The appellant's wife was shot and killed on the 15th day of November, 1946. The claim is here made that the evidence, uncontradicted, shows that the death was accidental.

The evidence placed before the jury showed the appellant, accompanied by his brother, going home by taxi on the evening of the killing; that he was under the influence of intoxicants and that the odor of strong drink was apparent; that he used an endearing term with reference to his wife while placing his arm around

her and that he went with his wife to their bedroom; that his brother went to the basement to be with the two children of the appellant; that the brother, for some reason, later went up the steps from the basement to the doorway of the bedroom; that when he was at the top of the steps he could look into the bedroom and see his brother, the appellant, but could not see his brother's wife; that as he reached that point he heard his brother say "Mabel watch that gun, its loaded"; that when he was at the top of the steps and heard his brother say "Mabel watch that gun, its loaded" he did not hear Mabel say anything; that the appellant was intoxicated, not normal, or natural, and that he said many times "why did I do it, God damn it, why did I do it, I don't know why I did it," or like expressions; that the appellant admitted to the sheriff that he had shot his wife; and that no claim of an accidental homicide was made at or near the time of the shooting. The evidence also showed that the automatic revolver, from which the fatal shot was fired, had two safety devices and a trigger; that the gun had an automatic grip safety at the rear of the butt or grip of the gun, and also a manually operated safety catch, both of which had to be on release before the gun could be fired by the pulling of the trigger.

From the above evidence and from the description of the room, the location of the furniture, the position of the parties, and the location of the body after the shooting, the jury had sufficient basis on which to base its conclusion. It is true the defense offered evidence that the shooting was an accident, but the jury evidently did not believe the story related by the appellant. It was claimed by the appellant that his wife had said "here you take it" while extending the gun to him and that at the time he and his wife were very close to each

other. By inference the first claim was disputed by the testimony of appellant's brother when he stated that he had heard his brother say "Mabel watch that gun, its loaded" but did not hear Mabel say anything, and the second claim was likewise disputed by inference when the brother stated that he could not see the appellant's wife although he could see the appellant at about the moment of the shooting. The jury saw the weapon from which the shot was fired and had explained to it the purpose and use of the safety feature on the grip or butt thereof, together with the operation of the manual safety catch.

The credibility of the witnesses and the weight to be given their testimony was for the jury. *Ross* v. *State* (1933), 204 Ind. 281, 289, 290, 182 N. E. 865, 868. The jury had the right to weigh the evidence and to believe or disbelieve any given item of evidence. The jurors watched the witnesses on the witness stand, they observed their demeanor, and their candor or lack of it. This court is in a different position and must get its knowledge of the cause from the cold, unfeeling record.

The rules applicable to the trial court and those which apply in this court are not the same. We do not have the same opportunity to observe the witnesses. The correct rules and their differences are stated in the late case of *McAdams* v. *State* (1948), 226 Ind. 405, 81 N. E. 2d 671. In the case of *Brown* v. *State* (1941), 219 Ind. 21, 22, 23, 36 N. E. 2d 759, 760, this court had before it a case where the evidence was largely circumstantial and, in disposing of it, said:

> "The appellant first undertakes to invoke the rule that circumstantial evidence, in order to sustain a conviction, must be of a conclusive character and

must exclude every reasonable hypothesis of innocence of the accused. The rule is sound, but it is for the guidance of trial courts and does not apply to the reviewing tribunal. Where circumstantial evidence is of a character that two conflicting inferences may reasonably be drawn therefrom, one tending to prove or favorable to the guilt of the accused and the other favorable to his innocence, it is not within the province of this court to determine which inference ought to control. *Rosenberg* v. *State* (1922), 192 Ind. 485, 134 N. E. 856, 137 N. E. 53. If, in a case where the evidence is conflicting, the trial court finds against the weight thereof, this constitutes an error of fact and not of law, and it is the duty of the trial court to correct such error by granting a new trial. The rule that this court will not weigh the evidence applies whether it is direct or circumstantial. *Howard* v. *State* (1921), 191 Ind. 232, 131 N. E. 403. It is only where there is no evidence from which the trial judge or jury, as the case may be, may reasonably have drawn an inference of guilt that the decision or verdict will be disturbed on appeal. *Scharillo* v. *State* (1934), 207 Ind. 22, 191 N. E. 77."

Since inferences to be drawn from the evidence lie within the province of the triers of the facts, *Cazak* v. *State* (1925), 196 Ind. 63, 147 N. E. 138, this court must accept as true such evidence and the inferences which may reasonably be drawn therefrom as tend to support and sustain the verdict. *Tutsbree* v. *State* (1925), 195 Ind. 581, 145 N. E. 490.

The jury could have inferred that the appellant and his wife were not close together at the time of the shooting and the jury likewise could have inferred that the victim did not ask the appellant to take the gun. The appellant's brother testified he did not hear his sister-in-law say anything although he did hear the words uttered by the appellant. The evidence was not such as to force but one inference or conclu-

sion. Conflicting inferences might reasonably be drawn therefrom. Taking into consideration all the evidence given in this cause, we find that there was evidence from which the guilt of the appellant could be inferred.

Appellant stresses the prior friendly relationship between him and the deceased. Granting, for the purpose of this opinion, that there is no evidence that the killing was done with premeditated malice and that the evidence only authorized the jury to find appellant guilty of murder in the second degree, the error was harmless because the punishment of imprisonment for life assessed by the jury is the same as that provided by statute for murder in the second degree. *McPherson* v. *State* (1912), 178 Ind. 583, 99 N. E. 984.

The judgment of the lower court is affirmed.

Gilkison, J., and Emmert, J., dissent.

NOTE.—Reported in 85 N. E. 2d 76.


DISSENTING OPINION

EMMERT, J.—At the close of the first argument in this appeal I was of the opinion that this conviction should be affirmed. However, after I had examined and studied the entire record in this case, which consists of some 250 pages, I became convinced that miscarriage of justice had occurred, and that the verdict was both not sustained by sufficient evidence and contrary to law. Upon a reargument of this case, in which the prosecuting attorney who had tried the case participated, the State presented no facts or law which would authorize an affirmance of this conviction. After a careful examination of the entire record the second time, as well as parts of it several additional times, I am of the firm belief that the affirmance of this conviction on such evidence as we have in the record puts in jeopardy

every user of firearms who may accidentally cause the death of another, by requiring him to sustain the burden of proving the death was accidental, and thus make him subject to conviction for first degree murder, with either a life or death sentence imposed. It has never been the law in this state that an accused has the burden of proving his innocence to be entitled to an acquittal. The burden to prove the material allegation of any criminal offense beyond a reasonable doubt rests upon the State throughout the trial, yet under the facts involved in this unfortunate accident the majority opinion has placed such burden upon the appellant.

It is true that in every criminal appeal we are dealing with a cold record, but the fact that we do not see the witnesses face to face and observe their manner and conduct on the witness stand, does not serve to place in the record evidence which is nonexistent, nor should it cause us to ignore uncontradicted evidence introduced by the State which is only consistent with the hypothesis that the accused is innocent.

To sustain this conviction, there must have been evidence presented to the jury which would justify it in finding the appellant did "purposely and with premeditated malice" slay his wife as charged in the indictment.[1] The appellant made no statements that he did the act purposely or with premeditation, or with malice. His direct evidence was that he had no such intent,

---

[1] Section 10-3401, Burns' 1942 Replacement. "Whoever purposely and with premeditated malice, or in the perpetration of or attempt to perpetrate a rape, arson, robbery, or burglary, kills any human being, is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life."

Section 10-3404, Burns' 1942 Replacement. "Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life."

premeditation or malice, and that the tragedy was an accident. The state has sought to sustain the verdict by circumstantial evidence on these material allegations of the indictment.

". . . When the sufficiency of circumstantial evidence is in question, as here, we examine it carefully, not for the purpose of finding whether or not it is adequate to overcome every reasonable hypothesis of innocence, but with the view of deciding whether an inference may be reasonably drawn therefrom tending to support the finding of the trial court. *Nelson* v. *State* (1928), 200 Ind. 292, 163 N. E. 95; *Faulkenberg* v. *State* (1926), 197 Ind. 491, 151 N. E. 382; *Henry* v. *State* (1925), 196 Ind. 14, 20, 146 N. E. 822; *Hiner* v. *State* (1925), 196 Ind. 594, 149 N. E. 168; *Falk* v. *State* (1914), 182 Ind. 317, 106 N. E. 354; *Cavendar* v. *State* (1890), 126 Ind. 47, 25 N. E. 875." *Dowty* v. *State* (1932), 203 Ind. 228, 235, 179 N. E. 720. See also *McAdams* v. *State* (1948), 226 Ind. 405, 81 N. E. 2d 671.

Appellant and his wife had been married for some years and had two small daughters who were playing in the basement at the time the appellant came home with his brother shortly after 6:00 o'clock the evening of November 15, 1946. Both men had had dinner in Jeffersonville. The appellant, before dinner, had had some drinks, and the evidence as to appellant's condition varied as to whether he was only under the influence of intoxicating liquors or drunk. Appellant's brother went down to the basement for a few minutes to visit with the small daughters who were playing there, while the appellant was changing his clothes preparatory to going out again that evening. There were three loaded guns in the bedroom, two of them at least having been pawned to him as security for loans. One of these guns was on the dresser.

The record does not contain any map or chart of the bedroom where the shooting occurred, but does contain two pictures of the inside of the bedroom, and a picture of the front of the house where the bedroom was located. The bedroom was small, the inside dimensions being 10 ft. 9¾ inches by 11 ft. From the location of the shadows in the pictures made by the sun, it appears that the bed was along the west wall with the head thereof being close to the north wall. Immediately by the head of the bed was a small night stand. At the foot of the bed and along the south wall was a chifforobe, and along the same wall immediately east of this was a cedar chest. A dresser was along the east wall in the southeast corner of the bedroom, and the door to a clothes closet opened along this east wall immediately north of the dresser. The door to the bedroom opened into a hallway in the northeast part of the bedroom. The appellant's testimony as to how the event occurred was not contradicted either by direct testimony or by any other facts or circumstances in evidence. The material questions and answers are as follows:

"A. She [decedent] came to the dresser and put her elbows on the dresser, the left elbow, and I was getting up then and buttoning up my underclothes and putting on my trunks, and this pistol was laying on this end of the dresser and she nearly knocked it off, and then she picked it up and started around [toward] the chifforobe to put it up, and I said, 'Watch out, Mabel, that gun is loaded,' and she said, 'Here, take it,' and I grabbed for it and it went off, and how it did, Judge, I don't know.

"Q. Did you say she had picked it up and started toward the chifforobe?

"A. Yes, I was standing up between her and the chifforobe, and there is very little distance between them.

"Q. That is four feet, four inches, is that right?

"A. Yes, and she went to the dresser again and

said, 'Here take it,' and I started to get it and it fired, and how it did, I don't know."

There was no post mortem performed upon the person of the decedent to determine the course the bullet took, what vital organs it injured, the amount of hemorrhage, if any, or the deflection of the projectile, if any, from contact with bones or tissue. The location of the empty cartridge case which was ejected from the gun, and the location of the hole which the bullet made in the wall after leaving the body of decedent all corroborated the appellant's testimony.

The State introduced appellant's brother as its own witness. He testified that he heard appellant say, "Mabel, watch that gun; its loaded," and that he saw his brother immediately after the shot, and that he had his hand up to his head and said "Charlie, call the doctor," and "Oh, Mabel," and started to cry. The witness did not call the doctor, but took the two children out of the house to the home of another brother.

The appellant made no attempt to flee, but at once called for a doctor, but when one arrived about 6:30 o'clock, his wife was dead. Appellant remained in the front room in a dazed and hysterical condition. A number of peace officers of the city and county came to the home, and not one of them asked him how the shooting had occurred, or gave any indication that they considered the event anything other than an accident. None of them told him he had murdered his wife, nor did the appellant in the absence of any such accusation protest his innocence, which would have cast suspicion upon his acts. He was grief stricken and crying. Various state's witnesses testified he said, "Why did I do it?" "Take me out and shoot me, Chuck." [The deputy sheriff.] "I don't know why I did it." His mind was in

a confused condition. Many times after he had been told his wife died, he asked how she was, and continued to do so even after he had been placed in jail. The coroner testified that when the appellant was in jail he asked how his wife was, and upon being told she had died said, "I didn't want it that way." The decedent's mother, who previously had lived with the family for more than seven years, testified that the two had never had any serious disagreements, and other witnesses corroborated her evidence.

There was no evidence that either the appellant or his wife were angry about anything, nor was any statement made from which a reasonable inference could be drawn that he had any ill will or malice toward her. The reasonable sense of appellant's statement, "Why did I do it" was, as appellant testified, "Why did I grab the pistol?" It was the natural expression of one who by his negligence had caused the death of a beloved member of his family. The statement made to the coroner did not indicate any guilt. When death makes an unexpected call within the family circle, how many times do we hear some surviving member say in substance "I" or "we didn't want it that way."

The State introduced testimony by a ballistics expert. It is difficult to see just what his evidence contributed to enlightening the jury, exclusive of his testimony with reference to the functioning of the lethal weapon. There is no testimony in the record as to the amount of pull required to depress either the trigger or the back strap safety. His opinion that the projectile came from the lethal weapon added nothing to the State's case, since it was admitted that the appellant had shot his wife with the gun in question. His guess that the gun had been discharged 30 inches from the dress of the decedent had no probative value whatever. The cartridge that

killed the decedent was Winchester ammunition, while the tests performed by the expert were with Peters ammunition. He made no attempt to determine any difference in the weight of volume of powder in the different ammunition, nor did he testify as to the age of each kind, nor did he make any examination of the ammunition in the gun to determine whether the primers were oil soaked or not. He did not disassemble any of the Winchester ammunition in this gun to determine what kind of powder was therein, and he admitted that he did not know the difference between a single base and a double base powder, and that he had never made any tests to determine the difference between a single base nitrocellulose and a double base nitroglycerine powder. His admissions more than affected his credibility; they affected his competency to express an opinion. Under such circumstances his statement on distance that "In this particular test, I couldn't make that a definite conclusion, but that was the result as nearly as I could tell" amounted to no more than a mere speculative guess, without probative value. The appellant should not be guessed into the state prison for life. Even if the gun had been discharged 30 inches from the decedent, that did not make the shooting any less of an accident. If it had been five feet away that fact might have had some probative value under the testimony in this case.

"Malice may be inferred from the intentional use of a deadly weapon in such a manner as likely to cause death. *Landreth* v. *State* (1930), 201 Ind. 691, 171 N. E. 192, 72 A. L. R. 891." *Mosier* v. *State* (1942), 219 Ind. 669, 672, 40 N. E. 2d 698. But before there is anything upon which to base the inference, the state must prove that the use was intentional. *Davis* v. *State* (1936), 210 Ind. 550, 2 N. E. 2d 983. It must be borne

in mind that the burden was upon the state to prove that the act was done "purposely" in order to constitute either murder in the first degree or murder in the second degree. The appellant was not required to prove that the shooting was an accident, but the state was required to prove that the shooting was not an accident.

"Mere suspicion of guilt arising from the proved circumstances cannot take the place of a reasonable inference." *Williams* v. *State* (1930), 90 Ind. App. 667, 674, 169 N. E. 698. If "there is a want of evidence to prove subsidiary facts justifying an inference of an essential fact or facts, *or that such fact or facts must have resulted from an inference wholly contrary to human experience and the natural relation of things*, the question is one of law. *Lee* v. *State* (1901), 156 Ind. 541; *Wrassman* v. *State* (1921), 191 Ind. 399; *Dunn* v. *State* (1906), 166 Ind. 694; *Robinson* v. *State* (1919), 188 Ind. 467; *State* v. *Fisk* (1908), 170 Ind. 166; *Commonwealth* v. *Webster* (1850), 5 Cush. (Mass.) 295, 52 Am. Dec. 711; *State* v. *Furney* (1889), 41 Kans. 115, 21 Pac. 213, 13 Am. St. 262; *People* v. *Willett* (1895), 105 Mich. 110, 62 N. W. 1115; *People* v. *Tobin* (1903), 176 N. Y. 278; *United States* v. *Searcey* (1885), 26 Fed. 435." (Italics added.) *Howard* v. *State* (1923), 193 Ind. 599, 603, 141 N. E. 341.

The appellant was not charged with negligence in the use of firearms or in having loaded firearms about his home. Accidents may happen with firearms as accidents may happen with countless other pieces of machinery in common use in this machine age. There was no evidence that the appellant was an expert or even familiar with automatic pistols, but this did not make his possession of them unlawful or furnish any basis for an inference that when he held the gun he did so with the intention of shooting his wife. None

of the appellant's statements made after the event furnish any reasonable or logical basis upon which to draw the inference that he intentionally shot his wife. To draw the inference that a husband, who was happily married with two small children, intentionally shot his wife for whom he had a great love and affection is "wholly contrary to human experience and the natural relation of things." *Howard* v. *State, supra,* p. 603. .Murder of one spouse by the other has been recognized as an unnatural crime by this court. *Lawson* v. *State* (1908), 171 Ind. 431, 84 N. E. 974.

It may be conceded that the appellant had the opportunity to commit murder, but no conviction should stand on guess or supposition. "If mere opportunity to murder is sufficient to convict then the life and liberty of many innocent people may be easily sacrificed. The law requires more than mere opportunity. It requires evidence to prove guilt beyond a reasonable doubt. It will not permit a mere possibility because of opportunity to take life or liberty. It does not require direct evidence, but if not direct, then *the circumstantial evidence must be such as to exclude every other reasonable hypothesis except that of guilt.*" (Italics added.) *Osbon* v. *State* (1938), 213 Ind. 413, 424, 13 N. E. 2d 223. This case then noted that a lack of motive, as is true in this appeal, is circumstantial evidence of innocence, and at page 425 quoted with approval the language in *People* v. *Lewis* (1937), 275 N. Y. 33, p. 42, 9 N. E. 2d 765, as follows:

" 'The evidence as a whole establishes a strong lack of motive and its absence is a powerful circumstance in the exculpation of the defendant where reliance is placed entirely upon circumstantial evidence to establish the crime.' "

This state does not follow the rule that a scintilla of evidence is sufficient to sustain a verdict for the proponent in civil cases. Even stronger reasons support the rule in criminal cases. "The scintilla of evidence rule does not obtain in this jurisdiction. The settled rule in this state requires that the material facts in issue be supported by some evidence, and this question is one of law reviewable on appeal. *Nordyke & Marmon Co.* v. *Whitehead* (1914), 183 Ind. 7, 106 N. E. 867."

"This court will not weigh evidence, nor will it say that a mere spark or trifle is sufficient to sustain an issuable fact. *Wright* v. *Bertiaux* (1903), 161 Ind. 124, 129, 66 N. E. 900." *Sullivan* v. *State* (1928), 200 Ind. 43, 47, 48, 161 N. E. 265.

Verdicts based on mere supposition, possibilities, suspicion or guess as to guilt have been condemned by this court in *Hiner* v. *State* (1925), 196 Ind. 594, 598, 599, 149 N. E. 168, in language applicable to this appeal: "It was within the province of the court in this case to weigh the evidence, but such mental process goes to the truth or falsity of the evidence, and does not extend to a calculation on the mere suspicions, possibilities, suppositions, to support the finding of guilty. *People* v. *Acerno* (1918), 172 N. Y. S. 373, 184 App. Div. 541; *State* v. *Chafin* (1916), 78 W. Va. 140, 88 S. E. 657; *Cohn* v. *Saidel* (1902), 71 N. H. 558, 53 Atl. 800.

"In the consideration of cases which rest partially or wholly upon circumstantial evidence, each case must be acted upon wholly by itself, and the result is to be determined from the circumstances peculiar to it. But all the circumstances as proved must be consistent with each other, and, taken together, they must point surely and unerringly in the direction of guilt. In the case at bar, the evidence falls far short of this rule and the court is of the opinion that the evidence, at best, but

supports a guess or a supposition that appellant was connected in any manner with the still and distilling apparatus. The conclusion follows that the finding of the trial court is not supported by sufficient evidence. . . ."

The Hiner case was approved by this court in *Wood* v. *State* (1934), 207 Ind. 235, 192 N. E. 257, wherein the court held a conviction should be reversed wherever "there is a want of evidence to prove subsidiary facts justifying an inference of an essential fact or facts necessary to be proven in order to sustain the verdict and judgment." p. 238. A subsidiary fact in this appeal which the state had to prove was the intentional use of the gun.

Inferences may not be based upon speculation or conjecture. The basis of inferences to support a presumption of fact, is probability. *Johnson* v. *State* (1926), 199 Ind. 73, 77, 155 N. E. 196. See also *Hunt* v. *State* (1939), 216 Ind. 171, 175, 23 N. E. 2d 681.

Without additional facts of circumstances which are not in evidence in this record, the state's position is reduced to the proposition that from the mere use of the gun the jury had the right to infer that the use was intentional in such a manner as was likely to cause death. To state the position is to prove its unreasonableness. When there is no evidence or circumstances from which the jury may reasonably draw an inference of intentional use, an inference of malice is wholly untenable. See *McAdams* v. *State* (1948), 226 Ind. 405, 81 N. E. 2d 671, *supra*.

Even a casual examination of the entire record in this appeal at once discloses that for the appellant it constitutes a tragedy of errors, so harmful and prejudicial under the authorities of this state, that the conclusion is inescapable that justice was not "adminis-

tered freely" or "completely, and without denial," as required by § 12 of Article 1 of the Constitution of Indiana. This court has no more grave and solemn duty to perform than the determination of appeals involving the life or liberty of those accused of crime. It must be conceded that these errors have not been presented in the briefs for appellant, and under our rules of procedure, many of them were waived in the trial court. But it is clearly apparent that the impact of these prejudicial errors have so distorted the issues under the evidence that the substantial rights of the appellant to a fair and impartial trial were destroyed.

Should this court in the exercise of its sound discretion consider such errors as disclosed by the entire record? We are not wanting in authority to do so. The United States Supreme Court has recognized this discretionary right in felony cases in *Brasfield* v. *United States* (1926), 272 U. S. 448, 450, 71 L. Ed. 345, 346, 47 S. Ct. 135. In reviewing a conviction of conspiracy to transport intoxicating liquors, Mr. Justice Stone, speaking for the court, said:

> "The failure of petitioners' counsel to particularize an exception to the court's inquiry does not preclude this court from correcting the error. Cf. *Wiborg* v. *United States,* 163 U. S. 632, 658, et seq., 41 L. ed. 289, 298, 16 Sup. Ct. Rep. 1127, 1197; *Clyatt* v. *United States,* 197 U. S. 207, 220, et seq., 49 L. ed. 726, 731, 25 Sup. Ct. Rep. 429; *Crawford* v. *United States,* 212 U. S. 183, 194, 53 L. ed. 465, 470, 29 Sup. Ct. Rep. 260; *Weems* v. *United States,* 217 U. S. 349, 362, 54 L. ed. 793, 796, 30 Sup. Ct. 554, 19 Ann. Cas. 705. . . ."

In *Fisher* v. *United States* (1946), 328 U. S. 463, 467, 468, 66 S. Ct. 1318, 1320, 90 L. Ed. 1382, 1386, 166 A. L. R. 1176, the United States Supreme Court again, on its own motion, examined the record for error, as stated by Mr. Justice Reed:

"Although no objection as to the form of these instructions is urged here by counsel for petitioner, this Court in a criminal case may notice material error within its power to correct even though that error is not specifically challenged and certainly should do so, even in cases from the District of Columbia, where life is at stake. . . ."

We have many times held that although we are not required to do so, we may consider errors which have not been properly presented to see that substantial justice has not been denied. *Thompson* v. *State* (1946), 224 Ind. 290, 293, 66 N. E. 2d 597; *Hicks* v. *State* (1938), 213 Ind. 277, 302, 11 N. E. 2d 171, 12 N. E. 2d 501; *Brown* v. *State* (1934), 206 Ind. 223, 189 N. E. 133; *Mack* v. *State* (1932), 203 Ind. 355, 361, 362, 180 N. E. 279, 83 A. L. R. 1349; *McCutcheon* v. *State* (1927), 199 Ind. 247, 251, 155 N. E. 544; *Marshall* v. *State* (1949), 227 Ind. 1, 83 N. E. 2d 763; *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769. Where the evidence on an essential element of the crime charged is weak, or no more than a scintilla, and wholly circumstantial, upon which a verdict assessing punishment and imprisonment for life is based, this court should notice the error it sees in the record, not only for the protection of the appellant, but also for the guidance of trial courts in the trial of other cases where imprisonment for life or the death penalty may be invoked. In such cases the trial judge must be more than a mere referee on the law, and it is his duty to correctly instruct on the law, and to refuse erroneous instructions even though no proper objections are made.

State's Instruction No. 9 informed the jury that:

"A deadly weapon is one likely, for the use made of it, to produce death or bodily injury, and if an act be perpetrated with a deadly weapon, used in such manner as to be likely to produce death, the

purpose of killing may be inferred from the act itself, upon the principle that everyone is presumed in law to intend the natural, necessary, and even probable consequences, of an act which he intentionally performs."

This was prejudicial error under the evidence in this case. There was no contention that the accused had not shot his wife when the gun was in his hand. The instruction omits the necessary element that he must have intentionally used the gun in such a manner as likely to produce death. He could have intentionally performed the act of reaching for the gun and intentionally performed the act of holding the gun without intentionally discharging the gun at his wife in such a manner as likely to produce death. It might even have been a probable consequence of his act intentionally performed in reaching for the gun, but still would not make it murder or any more than negligence, and under this instruction an accused could be guilty of murder when in fact he would only be guilty of negligence in the handling of the pistol.

State's Instruction No. 10 in part told the jury: "One who uses upon the person of another at some vital part of the body, with a manifest intention to use it, a deadly weapon such as a gun, *must*, in the absence of *qualifying facts*, be presumed to intend the death of that person, which is the ordinary result or consequence of the use of such a weapon upon the body of another." (Italics supplied.) This instruction failed to state what may be "qualifying facts," and was a mandatory misstatement of a rule permitting an inference of fact to be drawn by the jury. See *McHargue* v. *State* (1923), 193 Ind. 204, 212, 139 N. E. 316. It violates § 19 of Article 1 of our state Constitution which provides that in all criminal cases whatever the jury shall have the right to

determine the law and the facts. *Burrows* v. *State* (1894), 137 Ind. 474, 37 N. E. 271, 45 Am. St. 210. It sought to bind the conscience of the jury rather than enlighten their judgment. In criminal cases the jurors are not to be instructed, they *must* find this fact or that fact, or must convict if certain facts have been proved beyond a reasonable doubt. *Hudelson et al.* v. *The State* (1884), 94 Ind. 426, 48 Am. Rep. 171.

State's Instruction No. 13 was particularly harmful under the issues in evidence in this case. By it the jury was instructed:

"While it is necessary that every essential element of the crime charged against the accused should be proven by the evidence beyond a reasonable doubt, this does not mean that all the incidental or subsidiary facts should be proved beyond a reasonable doubt. Evidence is not to be considered in fragmentary parts, and as though a fact or circumstances stood apart from the others, but the entire evidence is to be considered. The weight of the testimony to be determined from the other evidence may be weak, if not improbable, but when viewed in connection with surrounding facts and circumstances, it may be so well supported as to remove all doubts as to its existence, as detailed by the witness. Acts when considered apart from all other evidence may appear innocent, but when considered with other evidence, may import guilt."

The State's effort to prove that the appellant intentionally used the gun in such a manner as likely to cause death was a subsidiary fact upon which the State sought to draw the inference that the shooting was done with malice. But by this instruction the jury was told that this subsidiary fact would not have to be proved beyond a reasonable doubt. If the instruction was correct, then proof by a preponderance of the evidence that the appellant intentionally used the gun in such a manner as like-

ly to cause death, would justify the inference that he intentionally shot his wife with malice, which is an essential element of murder, and must be proved beyond a reasonable doubt. Thus an issue which must be proved beyond a reasonable doubt could be sustained by evidence on an inference arising from a fact only proved by a preponderance of the evidence. The instruction applied to circumstantial evidence concerning which this court in *McAdams* v. *State* (1948), 226 Ind. 405, 412, 81 N. E. 2d 671, 675, *supra*, recently said:

> "When the evidence before the jury is entirely circumstantial, as in the case before us, certain rules have been established for the jury's guidance. It is not enough that the circumstances be consistent with the hypothesis of guilt. They must be of so conclusive a character and point so surely and unerringly to the guilt of the accused as to exclude every reasonable hypothesis of his innocence. *Heacock* v. *State* (1930), 202 Ind. 344, 353, and cases cited, 174 N. E. 283; *Scharillo* v. *State* (1934), 207 Ind. 22, 24, 191 N. E. 76; *Osborn* v. *State* (1937), 213 Ind. 413, 424, 13 N. E. 2d 223; *Falk* v. *State* (1914), 182 Ind. 317, 106 N. E. 354; *Robinson* v. *State* (1919), 188 Ind. 467, 124 N. E. 489; *Zimmerman* v. *State* (1921), 190 Ind. 537, 130 N. E. 235; *Osborn* v. *State* (1926), 199 Ind. 44, 46, 154 N. E. 865. It must be such that the trier of the facts may reasonably and naturally infer to a moral certainty the existence of the fact sought to be proved. *Howard* v. *State* (1923), 193 Ind. 599, 602, 141 N. E. 341."

Under this instruction the safeguards required in weighing circumstantial evidence were totally disregarded. It was well calculated to confuse the minds of the jurors so that when considering the evidence as applying to any essential allegation, a mere preponderance of the evidence might have been sufficient, if the evidence proved the other material allegations beyond a

reasonable doubt. Nor did any other instruction to the jury give this only safe standard to weigh circumstantial evidence.

State's Instruction No. 15 in part stated:

"In determining what facts are proven in this case, you should carefully consider all of the evidence before you, together with all of the circumstances of the transaction in question, as detailed by the witnesses during the trial; and you may find any fact proven which may be *rightfully* inferred from the evidence given in this case." (Italics supplied.)

The jury was not told what could be rightfully inferred or not rightfully inferred. The only inferences for the jury to draw must have been reasonable under the evidence. By this instruction the jury was left without any standard or guide whereby to determine the effect of circumstantial evidence.

State's Instruction No. 19 purported to give an exclusive definition of the rule of reasonable doubt. The concluding part stated:

". . . If the evidence when carefully examined, weighed, compared and considered, produces in your mind a settled conviction and belief, of the guilt of the defendant, such a conviction as you would be willing to act upon in the most weighty and important affairs of your life, you may be said to be free from a reasonable doubt, and you may find a verdict in accordance with that conviction and belief, and if you are satisfied beyond a reasonable doubt in this case, that the defendant is guilty it is your duty to convict him."

Concerning such an erroneous instruction this court in *Beneks* v. *State* (1935), 208 Ind. 317, 328, 196 N. E. 73, said:

". . . But the language approved by this court in many decisions is that the facts must have such

convincing force that the jurors would be willing to act upon them in matters of the highest importance, affecting their dearest interests, *where there is no compulsion to act at all;* and an instruction fixing a lower standard of certainty is erroneous. *Bradley* v. *State* (1870), 31 Ind. 492; *Densmore* v. *State, supra."* [1879, 67 Ind. 306.] (Italics added.)

Under the indictment and evidence in this case, State's Instruction No. 20 concerning intoxication was error. This instruction stated:

"Voluntary drunkenness can not justify, excuse, or mitigate the commission of a crime, and the fact, if it be a fact, that defendant may have been drunk at the time of the alleged killing should not be taken into consideration by the jury in making up their verdict."

Voluntary drunkenness may be considered in determining whether or not an accused has sufficient mental capacity to be able to deliberate or form rational determination on the purpose to take human life. When the charge is murder in the first degree, intoxication may be taken into consideration for the purpose solely of passing upon the fact of premeditation, which is an essential element to murder in the first degree. *Aszman* v. *The State* (1890), 123 Ind. 347, 24 N. E. 123, 8 L. R. A. 33. By this instruction the jury was erroneously prohibited from considering intoxication on this issue.

The State's instruction No. 23 embodied part of the language of the last instruction given in *Hinshaw* v. *State* (1897), 147 Ind. 334, 384, 385, 47 N. E. 157, which this court held was not reversible error, but which has generally become known throughout the legal profession as the "bugle call for conviction." It is not necessary here to review the correctness of the Hinshaw instruction. But instruction No. 23 went far beyond the Hin-

shaw instruction. In any event it must always be remembered that any instruction must be applicable to the facts in evidence at the trial in which the instruction is given. At the beginning of No. 23, it states that "The Counsel engaged in this case have been untiring in their efforts to bring before you all possible evidence that may aid you in arriving at the truth." It requires no extended examination of the record to reveal that this was not substantially true. The State neither presented all the evidence which it could have presented which would have aided the jury, nor did it refrain from presenting incompetent and irrelevant evidence which was highly prejudicial to the appellant. The instruction served to reaffirm the errors embodied in the giving of other instructions already discussed. It ignored the constitutional provision that in criminal cases the jury has the right to determine the law as well as the facts. It was loaded with the innuendo that the appellant was a guilty criminal, and the jury could well have assumed that the judge thought that the appellant was a guilty criminal. It sought to bind the conscience of the jurors by telling them what the law demanded. It left the jury under the impression that the guilty must be convicted whether or not they had been proved guilty beyond a reasonable doubt, and it ignored the presumption of innocence of the accused. The entire tenor of the instruction was such as to prejudice the substantial rights of the appellant, and its giving constituted prejudicial error.

Appellant's requested Instruction No. 4 was refused by the court. In substance it stated the rule in Indiana that each juror in a criminal case should be convinced that the defendant had been proved guilty beyond a reasonable doubt before he should vote for a conviction. It correctly stated the law. *Stillson* v. *State*

(1933), 204 Ind. 379, 184 N. E. 260; *Headlee* v. *State* (1930), 201 Ind. 545, 168 N. E. 692, 170 N. E. 433. The subject was not covered by any other instruction, and its refusal was prejudicial error to the appellant.

Appellant's requested instruction No. 13, which was refused by the court, should have been given. It stated that "The jury are instructed that you must be on your guard against conviction from prejudice or insufficient evidence. Unless you are satisfied from the evidence, beyond a reasonable doubt, of the guilt of the defendant, you should render a verdict of not guilty, however strong may be your prejudice, if any you have." In this case there was considerable testimony that the appellant was engaged in the gambling business, and that at the time of the tragedy he was either under the influence of intoxicating liquors or he was intoxicated. The appellant was not indicted for violation of the gambling laws, or for any offense involving intoxicating liquors. He was entitled to have the jurors determine the issues charged without having their minds poisoned by the fact that the appellant was a gambler or that he did drink alcoholic beverages. Under the evidence in this case the refusal to give this instruction was particularly harmful and prejudicial to the appellant. He was entitled to a fair and impartial trial and the jury should have been admonished, as requested, that the verdict should not be the result of prejudice.

The appellant presented a number of witnesses who testified that his reputation for peace and quietude prior to November 15, 1946, was good. On cross-examination the prosecuting attorney, over the objection of appellant's counsel, was permitted to cross-examine these witnesses, not as to rumors they may have heard about his conduct prior to that time, but as to his being intoxicated within two years prior to November 15, 1946, as

to his being an alleged part owner of a gambling place, and also on the assumption that on the 15th day of November, 1946, the appellant "took a .32 automatic pistol and shot his wife and killed her." In criminal cases, the accused may offer in evidence reputation that the trait of character involved in the charge was good prior to the commission of the alleged offense. "Evidence of the general reputation of the accused for peace and quietude is permissible in a prosecution for murder, though the murder may have been committed by poisoning. In a criminal charge the accused has the right to prove a character which would make it unlikely that he would be guilty of the particular crime with which he is charged. Wharton Crim. Ev. (9th ed.), § 60." *Hall* v. *The State* (1892), 132 Ind. 317, 323, 31 N. E. 536. See also I *Wigmore on Evidence* (3rd ed.), § 56; 16 C. J. 580, § 1122; Ewbank, *Indiana Criminal Law* (2d ed.), 417, § 600; Underhill. *Criminal Evidence* (4th ed.), §§ 285, 465.

This court has previously held under a charge of conspiracy to commit the felonies of vehicle taking, and receiving and concealing a stolen automobile, admission of evidence that the accused was intoxicated seven months before the automobile was stolen was prejudicial error. In *Davis* v. *State* (1926), 197 Ind. 448, 453, 151 N. E. 329. the court said:

> ". . . Such proof of his intoxication did not tend to rebut the testimony that his general character for honesty and integrity was good. Evidence of specific acts is not competent to prove general reputation. *Griffith* v. *State* (1895), 140 Ind. 163, 39 N. E. 440; *Dunn* v. *State* (1904), 162 Ind. 174, 182, 70 N. E. 521. *And while the fact that defendant had been seen intoxicated could not have any probative value to establish whether or not his general character for honesty and integrity was good*

*or bad, it might be highly prejudicial before a jury.*
This evidence should not have been admitted."
(Italics supplied.)

The same reasons make harmful the evidence concerning the gambling activities of the appellant. But even more prejudicial was the action on the part of the state in cross-examining the witnesses on reputation for peace and quietude on the basis that his reputation for peace and quietude was bad if appellant shot his wife. The appellant's direct examination limited the evidence prior to the date of the charged offense. The cross-examination by the prosecuting attorney included the time of the alleged offense. "The rule is that when a party to a criminal or other case is entitled to prove his good character, it is limited to the trait of character involved in the crime charged. But such evidence must be limited to proof of such person's general character as to such trait as it existed before the alleged offense or *'ante litem motam.'* *Walker* v. *State* (1885), 102 Ind. 502; *State* v. *Bloom* (1879), 68 Ind. 54, 34 Am. Rep. 247; 16 Cyc. 1278." *In re Darrow and Tablot* (1910), 175 Ind. 44, 52, 92 N. E. 369. In discussing the problem, Dean Wigmore in his treatise on evidence, Vol. 5, § 1618, p. 492, takes cognizance of the reason for the rule in the following language:

"(a) Where the desired character is that of a *party*—for example, the defendant in a criminal charge, the prosecutrix in a rape charge, or the plaintiff in a statutory action for seduction—it is obvious that after the charge has become a matter of public discussion, and partisan feeling on either side has had an opportunity to produce an effect, a false reputation is likely to be created,—a reputation based perhaps in part upon rumors about the very act charged or upon interested utterances of either party. The safeguards of trustworthiness are here lacking:

"1863, Battle, J., in *State* v. *Johnson*, Winston 151: 'Upon principle, it ought to be confined to the time when the charge was first made. A different rule will expose the defendant to the greater danger of having his character ruined or badly damaged by the arts of a popular or artful prosecutor, stimulated to activity by the hope of thus making his prosecution successful. Evidence of character is of the nature of hearsay; and the general rule in relation to that kind of testimony is that it shall not be received if the hearsay be *"post litem motam."* '

"1882, Hines, J., in *White* v. *Com.*, 80 Ky. 486: 'The only reason for stopping the inquiry at either point [time of discovery or time of arrest] is that the probabilities of innocence derived from previous good character may not be destroyed or embarrassed by the fact that the offence under consideration has been committed. . . . After the discovery that an offence has been committed, a previous good character may be destroyed and a bad one created by discussion of the circumstances connected with the offence, as well before as after the formal charge by legal proceeding is had.'

"Accordingly, it is generally agreed that a reputation at any time *after a charge published,* or other controversy begun, is not admissible. . . ."

See also Underhill, *Criminal Evidence* (4th ed.), p. 306, § 173; 16 C. J. 581, § 1123. The effect of such cross-examination was to absolutely destroy the value of this evidence for the appellant.

When the record is considered in its entirety, it is understandable how the jury was misled by the instructions so that it could believe that the law as applied to the evidence justified a verdict of guilty. But it is our duty to reverse when we find the evidence insufficient to sustain the verdict. There was a total failure of the evidence to sustain the charge of malice either under the charge of murder in the first degree or murder in the second degree, nor was there any evidence of

premeditation. The errors herein noted were substantial and harmful, and the appellant received neither a fair trial nor substantial justice. The judgment should have been reversed.

## DISSENTING OPINION

GILKISON, J.—I concur fully with the dissenting opinion of Emmert, J., filed in this case.

The appellant was charged with, and convicted of murder in the first degree. Our statute so far as applicable to the charge in this case is as follows:

"Whoever purposely and with premeditated malice, . . . kills any human being, is guilty of murder in the first degree, . . ." Burns' 1942 Replacement, § 10-3401.

I shall consider only whether there is any evidence in the record or any proper inference showing (1) that the killing was purposely done or (2) done with premeditated malice.

Of course, the burden of proving the charge was upon the state, and no part of this burden could shift from the state to the defendant at any time. *Biggs* v. *State* (1929), 201 Ind. 200, 205, 167 N. E. 129; *Fehlman* v. *State* (1928), 199 Ind. 746, 755, 161 N. E. 8.

Our law provides that "a defendant is presumed to be innocent *until the contrary is proved*." (My italics.) Section 9-1806, Burns' 1942 Replacement. This is a very strong presumption, and our court has universally held that it continues throughout the trial, and that the jury should weigh the evidence in the light of, and endeavor to reconcile the evidence with, this presumption. *Sims* v. *State* (1931), 197 Ind. 311, 321, 147 N. E. 520; *Saraceno* v. *State* (1931), 202 Ind. 663, 667, 177 N. E. 436; *Farley* v. *State* (1890), 127 Ind. 419, 26 N. E. 898.

I recognize fully the difference in the rule applicable in the trial court during the trial and in the consideration of the motion for new trial, and that applicable in this court on appeal. This difference is correctly explained with many supporting authorities in *Luttrell* v. *State* (1932), 204 Ind. 116, 119, 183 N. E. 318. These rules properly applied and exercised are salutary and helpful both to the trial court in the trial and to the Appellate or Supreme Court on appeal, in the performance of their respective duties, which are always to do justice to litigants; for, *"To do justice is an ever persistent rule to which all others must yield." Farmers' Bank and Trust Co., Receiver* v. *Brown et al.* (1933), 249 Ky. 820, 61 S. W. 2d 628, 629, 91 A. L. R. 323, 325, 326; *McCague* v. *New York C. & St. L. R. Co.* (1947), 225 Ind. 83, 92, 71 N. E. 2d 569, 573, 574. If there is a failure to apply the applicable rule in either court, or if the applicable rule is applied to excess in either court and as a result justice is not done, there is reversible error. I think the record in this case conclusively shows that the trial court failed to apply the rule that should have governed it, and that the majority opinion of this court applies the rule governing it to excess and as a result justice not only has not been done, but has been denied.

On appeal there is a presumption of correct action in the trial court, but this presumption prevails only *"until overcome by a showing of no evidence to prove some material fact* or for some other cause it affirmatively appears that the defendant was prevented from having a fair trial."* (My italics.) *Luttrell* v. *State supra,* p. 119. On appeal by defendant this court will consider only the evidence most favorable to the state with *proper* inferences to be drawn therefrom. It will not consider evidence which merely contradicts the evidence

of the state. In this dissent I shall be bound by these rules.

I recognize fully the right and duty of the trial jury and trial court to draw *proper* inferences from the evidence produced in the trial. But in every instance in which the courts have discussed the above rule, they have said such inferences must be *proper* and reasonable inferences, and such as reasonably and naturally flow from the evidence. 20 Am. Jur., Evidence, § 158, pp. 161, 162; *Russell* v. *Scharfe* (1921), 76 Ind. App. 191, 197, 130 N. E. 437. If unreasonable and unnatural inferences must be indulged to support the finding and judgment rendered below, then that finding and judgment is erroneous. If there is no evidence whatever upon which to base the inferences drawn, the finding and judgment is likewise erroneous, because it is a mere speculation or guess. *Hudson* v. *State* (1926), 198 Ind. 422, 426, 154 N. E. 7; *United States* v. *Ross* (1876), 92 U. S. 281, 283, 23 L. Ed. 707, 708. When a fact is clearly established by undisputed evidence there is then no room for an inference that such fact does not exist. *N. Y. Central R. R. Co.* v. *Green, Admx.* (1938), 105 Ind. App. 488, 496, 497, 15 N. E. 2d 748.

(1) The burden is upon the state in this case to show by the evidence that appellant purposely or intentionally shot and killed his wife. Neither the trial jury nor trial court can infer or presume this fact without some evidence upon which to base the inference or presumption. *Minardo* v. *State* (1932), 204 Ind. 422, 427, 183 N. E. 548, and cases cited. *Kilgore* v. *Gannon* (1916), 185 Ind. 682, 684, et seq., 114 N. E. 446, and authorities cited. *Welty* v. *State* (1912), 180 Ind. 411, 422, et seq., 110 N. E. 73, and cases cited; *N. Y. Central R. R. Co.* v. *Green, Admx., supra,* pp. 496, 497; *The Cleveland*

*etc. R. W. Co.* v. *Miller, Admr.* (1898), 149 Ind. 490, 507, 508, 49 N. E. 445.

> "Mere surmises, guesses, or conjectures of the jury can lend no support to their verdicts. In *Babcock* v. *Fitchburg R. R. Co.,* 140 N. Y. 308, it is said: 'Verdicts must stand upon evidence and not upon mere conjecture, however plausible, and if the situation be such that the plaintiff cannot furnish the evidence the misfortune is his." *The Cleveland Etc. Ry. Co.* v. *Miller, Admr., supra,* p. 508.

Since appellant's sole and only defense in the trial court and on appeal was and is that the shooting was wholly accidental, it becomes absolutely necessary that we examine the record carefully to ascertain whether there is any evidence of a purposeful and intentional shooting by appellant. This requires that I supply from the record, evidence omitted in the majority opinion.

To prove this essential fact the state placed appellant's brother, Charles, on the witness stand, thereby certifying to his veracity. On this subject he testified for the state in substance as follows:

> We got to Kenneth's house that evening about 6:30. When we went in the house Kenneth put his arms around Mabel and said: "Charlie, this is the best gal in the world." Kenneth asked her to get him a change of clothes—he had spilled some water on himself while eating dinner at the Brown Derby. She said "all right" and they went to their bedroom. A little later he heard appellant say: "Mabel, watch that gun its loaded." Then he heard a shot. Immediately after the shot Kenneth said: "Charlie call the doctor." Then he said, "Oh Mabel," and started to cry.

This was the state's sole evidence to establish that appellant purposely and intentionally killed his wife.

But of course the state is entitled to have the advantage of anything appellant may have proved on this sub-

ject. The only proof appellant offered on this proposition was his own evidence. Since his evidence in no way refutes the evidence of the state, but is wholly corroborative thereof, and is more complete, because of his better position, for seeing and hearing all that occurred at the time of the tragedy, I shall give its substance. It is as follows:

When I went in the house that evening I said: "Mabel, get me some dry clothes. I'm all wet." She said "Okey." I put my arms around her and said: "Charlie this is the sweetest little girl in the world." We went in the bedroom and she was getting me some dry clothes. She said: "You'd better stay in and get rid of that cold." I said I had to take Charles home, and she said: "We'll both go." We then talked about our daughter Susan dancing at school. She got up and picked up the sweater I took off, and hung it in the clothes closet. She came to the dresser and put her elbow on it and I was buttoning up my underclothes and putting on my trunks, and she nearly knocked the pistol off the dresser, then she picked it up and started around toward the chifforobe and I said "Watch out, Mabel, that gun is loaded." She said: "Here take it," "And I grabbed for it and it went off, and how it did, Judge, I don't know." Then I saw Charles and told him to call a doctor. When I saw she was shot I tried to put her in the bed, but I couldn't hold her, so I put her down on the floor.

The foregoing was all the evidence in the case from any source whatever as to appellant's purpose and intent in the shooting.

Appellant's brother as a witness for the state testified that he and appellant each had drunk two bottles of beer in the afternoon, and a short beer and a bottle of beer each with their steak dinner. There was no other proof of drinking by appellant. After the shooting the evidence indicates that appellant was suffering torture

from distractive grief, saying frequently "Why did I do it. Why did I do it," and similar expressions.

With this the only evidence on the proposition of purpose and intention before us it seems to me that no inference that appellant purposely and intentionally shot his wife can possibly be indulged, and therefore the action of the jury and trial court is arbitrary and capricious. Such an inference, in the face of this evidence, is surely too violently erroneous to merit the approval of this court. An inference cannot be said to be reasonable when it can be drawn only by a capricious disregard of apparent truthful testimony that is in itself probable and is not at variance with other proven or admitted facts. *Pioneer Coal Co.* v. *Hardesty* (1921), 77 Ind. App. 205, 208, 133 N. E. 398; *Russell* v. *Sharfe*, *supra.* On the contrary the evidence produced by the state, and considering only that most favorable to the state, conclusively establishes that the occurrence was an unfortunate and most distracting accident. The law books are profuse with definitions of the word "accident." I selected as an apt, typical and correct definition the following:

> "The word may be employed as denoting a calamity, casualty, catastrophe, disaster, an undesirable or unfortunate happening; an unexpected personal injury resulting from an unlooked for mishap or occurrence; any unpleasant or unfortunate occurrence that causes injury, loss, suffering or death; some untoward occurrence aside from the usual course of events."

1 C. J. S., Accident, p. 427 to 431. Black's Law Dictionary, 3rd Ed., p. 23; *The Wabash, St. Louis and Pacific Railway Co.* v. *Locke, Administrator* (1887), 112 Ind. 404, 411, 14 N. E. 391.

Our Appellate Court has accepted the above defini-

tions in substance in determining whether an alleged injury was cognizable under the Indiana Employers Liability Act, or was an accident cognizable only under the Indiana Workmen's Compensation Law. Judge Wood of that court after giving a definition of the word "accident" "as an unlooked for mishap, an untoward event, which is not expected or designed," as "repeatedly defined" by that court, then quoted with approval from *Western Commercial Traveler's Association* v. *Smith* (1898), 85 Fed. 401, 40 L. R. A. 653, "as to the meaning of accidental means" as follows:

> " 'An effect which is not the natural or probable consequence of the means which produced it, *an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means.* It was produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means.' "
> (My italics.)

*General Printing Corp.* v. *Umback, Admx.* (1935), 100 Ind. App. 285, 292, 195 N. E. 281.

This quotation was also used with approval by Nichols, J., in *General etc. Tank Car. Corp.* v. *Weirick* (1921), 77 Ind. App. 242, 245, 133 N. E. 391.

If we should indulge the inference that the defendant was under the influence of intoxicants, and that because of that fact he was awkard, his reflexes irregular and unsteady, and that this caused the negligent firing of the gun that killed his wife, (which is the strongest possible inference against appellant permitted by the

evidence), he would still not be guilty of any crime under our law. This court in a case that has facts strikingly similar to this case, has recently held that a death caused by a negligent but unintentional act of another is not a crime and is not murder, speaking by Fansler, J., as follows:

"The 'law' never presumes murder upon any state of facts. . . . If the death of a person is caused by the negligent but unintentional act of another, it is not excusable or justified. It is a wrong, a tort, *but it is not a crime and it is not murder.* . . ." (My italics.) *Miller* v. *State* (1944), 223 Ind. 50, 56, 58 N. E. 2d 114.

On appeal this court will not allow actionable negligence to be presumed to support a verdict and judgment for money damages rendered in a civil case, where an injury results to an innocent person from the happening of the event, the cause of which is not specifically proven. *National Biscuit Co.* v. *Wilson* (1907), 169 Ind. 442, 446, 447, 82 N. E. 916, and the many authorities there cited. In such a situation the rule *res ipsa loquiter* is not allowed to support an inference of negligence. Since this is true in a civil case for the collection of money damages from a defendant, what reason can be given for the allowance of such an inference to support a verdict and judgment in a case of murder in the first degree, in lieu and instead of evidence of intentional and purposeful killing, in a similar situation, where not money, but the liberty for life of a defendant is involved?

It seems to be the universal rule of evidence, that the facts, upon which an inference may be based, should be established "by direct evidence, as if such facts were the very facts in issue." *Hudson* v. *State, supra; United States* v. *Ross, supra; Globe Accident Ins. Co.* v. *Gerisch*

(1896), 163 Ill. 625, 54 Am. St. 486, 489. In *United States* v. *Ross, supra,* at pages 283, 284 U. S., page 708 L. Ed., Mr. Justice Strong, in language which we must approve, said:

> "No inference of fact or law is reliable, drawn from premises which are uncertain. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, *and not themselves presumed.*" (My italics.)

Since there is no evidence in the record whatever from which the jury or the trial court could have properly drawn an inference that appellant purposely fired the weapon that killed his wife, the verdict and judgment are contrary to law, and the cause should be reversed.

(2) Another proposition I wish to present is this: Is there any evidence that at the time the weapon was fired or at any time, appellant entertained premeditated malice toward his wife? I have noted evidence in discussing the proposition of "purposeful killing" that properly may be considered on the subject of "premeditated malice." There is other evidence noted in the dissenting opinion of Emmert, J., that should be considered on this proposition. It may be firmly asserted from the evidence without fear of any contradiction that throughout their married life appellant and his wife sustained a very happy marital relation. The evidence conclusively—without a single discordant note—proves that each had for the other an abiding respect and love, and that on the part of appellant this continued to, and continues after the wife's death.

I am fully aware of the trite rule that malice may be inferred from the *intentional* or *purposeful* use of a deadly weapon in such a manner as likely to produce death. But in this case there is an entire absence of

evidence of any *intentional* or *purposeful* use of the lethal weapon. The record affirmatively shows that the trial jury and trial court inferred or presumed the *intentional* use of the deadly weapon contrary to all the evidence in the case and without a solitary fact or circumstance upon which to base such inference or presumption. This was an arbitrary capricious and unwarranted inference. The majority opinion takes umbrage behind the presumption of correct action in the trial court, without considering the effective part of the rule, that this presumption "prevails only until overcome by a showing of no evidence to prove a material fact. . . ." *Luttrell* v. *State, supra,* p. 119. This is an arbitrary and capricious presumption.

Of course, an essential element in the proof of an offense, may not be proved by an inference which is founded wholly upon another inference that is, itself, a mere conjecture or guess. *Smith* v. *State* (1928), 200 Ind. 411, 414, 164 N. E. 268; *Fehlman* v. *State, supra; Johnson* v. *State* (1927), 199 Ind. 73, 77, 155 N. E. 196; *Hudson* v. *State, supra; Titzer* v. *State* (1930), 201 Ind. 643, 648, 649, 171 N. E. 7; *Young* v. *Montgomery* (1903), 161 Ind. 68, 69, 70, 67 N. E. 684; *Pittsburgh, etc. R. Co.* v. *Vance* (1915), 58 Ind. App. 1, 6, 108 N. E. 158; *Orey* v. *Mutual Life Insurance Co.* (1938), 215 Ind. 305, 309, 19 N. E. 2d 547; *United States* v. *Ross, supra.* And even if a presumption may sometimes exist, it "becomes of no avail as evidence to be considered by the court or jury, as soon as evidence is introduced in opposition." *Kilgore* v. *Gannon, supra; Welty* v. *State, supra; Lincoln* v. *French* (1882), 105 U. S. 614, 26 L. Ed. 1189, 1190.

"When all the facts attendant upon the killing are before the jury, there is no room for a presumption of malice, and malice must be proved be-

yond a reasonable doubt without presumptions to aid it, the same as with respect to other material questions in order to constitute the degree of crime of which one is convicted." *Welty* v. *State, supra,* page 421, 422 et seq. and cases cited.

The court quoted with approval from *Hawthorne* v. *State* (1881), 58 Miss. 778, on 787, as follows:

". . . If the attendant circumstances are shown in evidence, whether on the part of the State or the accused, the character of the killing is to be determined by considering them, and it is then not a matter for presumption, *which operates in the absence of explanatory evidence,* but for determination from the circumstances shown in evidence. . . ." (My italics.)

Since there is no evidence in the record from which any inference of premeditated malice upon the part of appellant could lawfully be inferred, and any presumption of such malice to support the verdict and judgment, is completely overcome by the evidence, the judgment is contrary to law, and it should be reversed.